**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF MISSISSISSIPPI**

**IN RE:**

       **STEPHEN RICHARD COLSON,**          **CASE NO. 09-51954-NPO**

       **DEBTOR.**               **CHAPTER 7**

**FIDELITY NATIONAL TITLE INSURANCE**
**COMPANY AS SUCCESSOR-IN-INTEREST OF**
**LAWYERS TITLE INSURANCE CORPORATION**      **PLAINTIFF**

**VS.**              **ADV. PROC. NO. 10-05007-NPO**

**STEPHEN RICHARD COLSON**         **DEFENDANT**

**MEMORANDUM OPINION**
**AND ORDER ON DISCHARGEABILITY**
**OF DEBT TO FIDELITY NATIONAL TITLE**
**INSURANCE COMPANY AS SUCCESSOR-IN-INTEREST**
**OF LAWYERS TITLE INSURANCE CORPORATION**

This matter came before the Court for trial on January 14-16, January 28-29, and August 20, 2013 (the "Trial"), on the First Amended Complaint to Determine Dischargeability of the Debt to Lawyers Title Insurance Corporation Under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(2)(B), 523(a)(4) and 523(a)(6) (the "Complaint") (Adv. Dkt. 2)[1] filed by Fidelity National Title Insurance Company ("Fidelity"), as the successor-in-interest of Lawyers Title Insurance Corporation ("Lawyers Title"),[2] and Defendant Stephen Richard Colson's Answer to First Amended Complaint and Affirmative

---

[1] Citations to the record are as follows: (1) citations to docket entries in this adversary proceeding, Adv. Proc. No. 10-05007-NPO, are cited as "(Adv. Dkt. ___)"; (2) citations to docket entries in the main bankruptcy case, Case No. 09-51954-NPO, are cited as "(Dkt. ___)"; and (3) citations to docket entries in other related, but separate adversary proceedings are cited by the number of the proceeding followed by the docket number.

[2] *See* Order Regarding Motion to Change Name on the Court's Docket Regarding Lawyers Title Insurance Corporation. (Adv. Dkt. 46).

Page 1 of 74

Defenses (the "Answer") (Adv. Dkt. 21) filed by the Debtor, Stephen Richard Colson ("Colson"), in the above-referenced adversary proceeding (the "Adversary").   On December 21, 2012, Fidelity submitted Plaintiff's Pretrial Brief (Adv. Dkt. 90), and Colson submitted Defendant Stephen R. Colson's Trial Brief (Adv. Dkt. 89).  The Final Pretrial Order (the "Pre-trial Order") (Adv. Dkt. 100) was entered on January 16, 2013.

At Trial, Sheryl W. Bey and Alan L. Smith represented Fidelity, and William Alex Brady, II, represented Colson.  During the course of the Trial, Fidelity called five (5) witnesses: Christopher Frederick Patrick ("Patrick"), internal investigations manager with Fidelity; Roy Perilloux, state manager of Security Title Guarantee Corporation of Baltimore in Mississippi; Robert Perry, Jr. ("Perry"), vice-president and associate counsel of Fidelity; Donna Marie Ingram ("Ingram"), certified public accountant and certified fraud examiner; and John Howard Shows ("Shows"), a licensed attorney in Mississippi.

Colson testified at Trial on his own behalf and called one other witness, Robert Lee Culumber ("Culumber"), a certified public accountant.  Also, Colson introduced into evidence transcripts of the deposition testimony of Lisa Houston ("Houston") and Leslie Swanzy ("Swanzy").[3]  The parties stipulated to the admissibility of the transcripts during the course of the Trial.

On February 18, 2013, Fidelity submitted Plaintiff's Finding of Facts (Adv. Dkt. 116), and Colson submitted Defendant's Proposed Findings of Fact and Conclusions of Law (Adv. Dkt. 117).  Then, on March 8, 2013, Fidelity submitted Fidelity National Title Insurance Company's Post-Trial Brief on Limited Issues (Adv. Dkt. 118), and Colson submitted Defendant's Post-Trial Brief (Adv. Dkt. 119).   At that time, *Bullock v.*

---

[3] The deposition testimony of Swanzy is cited as "(Swanzy Dep. at ___)".  The deposition testimony of Houston is cited as "(Houston Dep. at ___)".

*BankChampaign, N.A. (In re Bullock)*, 133 S. Ct. 526 (2012), was set for oral argument before the United States Supreme Court. Because the issues on appeal in *Bullock* included the meaning of "defalcation," as used in 11 U.S.C. § 523(a)(4),[4] and because Fidelity's dischargeability claim was premised in part on Colson's alleged "defalcation," the Court on April 2, 2013, entered an Order Holding Adversary in Abeyance (Adv. Dkt. 120). After the Supreme Court issued its decision on May 13, 2013, in *Bullock v. BankChampaign, N.A.*, 133 S. Ct. 1754 (2013), the Court entered an order (Adv. Dkt. 121) requiring both parties to submit briefs applying *Bullock* to the facts of the Adversary.[5] Fidelity filed the Fidelity National Title Insurance Company's Post-Trial Brief on *Bullock v. BankChampaign, N.A.* ("Fidelity *Bullock* Brief") (Adv. Dkt. 122) on May 28, 2013, and Colson filed the Defendant's Post-Trial Brief Applying *Bullock v. BankChampaign, N.A.*, 2013 U.S. LEXIS 3521 (May 13, 2013) (Adv. Dkt. 125) on June 5, 2013.

In the Fidelity *Bullock* Brief, Fidelity asked the Court to reopen the trial to supplement the testimony of Shows, its expert witness. Colson filed Defendant Colson's Response to Fidelity's Request to Reopen the Trial of the Adversary (Adv. Dkt. 127) on June 20, 2013. A hearing on the request to reopen was held on July 24, 2013, and the Court entered the Memorandum Opinion and Order Granting Request to Reopen Adversary Trial (Adv. Dkt. 131). The Trial resumed on August 20, 2013, at which time Fidelity recalled Shows to testify regarding Colson's conduct in light of the new intent requirement for defalcation, as announced in *Bullock*. Having considered the pleadings

---

[4] Hereinafter, all code sections refer to the United States Bankruptcy Code found at Title 11 of the United States Code unless otherwise noted.

[5] The parties apparently agree that *Bullock* applies to the Adversary.

as well as the testimony, exhibits, and the arguments of counsel presented at Trial and in the pre-trial and post-trial briefs, the Court finds that Colson breached a fiduciary duty and that the debt to Fidelity is nondischargeable because Colson committed a defalcation while acting in a fiduciary capacity.

**TABLE OF CONTENTS**

JURISDICTION ....................................................................................................................5

INTRODUCTION ................................................................................................................5

FACTS ....................................................................................................................................9

DISCUSSION ......................................................................................................................47

I.    State-law Claims ....................................................................................................47

        A.  Choice of Law ..............................................................................................47

        B.  Breach of Fiduciary Duty ..........................................................................50

II.   Dischargeability of Claim ....................................................................................53

        A.  Fiduciary Capacity ......................................................................................54

        B.  Defalcation ....................................................................................................56

              1.  Ingram ..................................................................................................60

              2.  Culumber ............................................................................................63

              3.  Shows ....................................................................................................63

        C.  Court's Application of *Bullock* ..............................................................65

III.  Attorneys' Fees and Expenses ............................................................................73

CONCLUSION....................................................................................................................74

## JURISDICTION

This Court has jurisdiction over the subject matter of and the parties to the Adversary pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(I).[6]  Notice of the Trial was proper under the circumstances.

## INTRODUCTION

Colson is a former real estate lawyer and business owner.  Included among the many businesses he owned were two title insurance companies, Prestige Title Inc. ("Prestige") and Advanced Title & Escrow, LLC ("Advanced Title").  It is these businesses that are relevant to the Adversary.  Together, Prestige and Advanced Title sometimes are referred to as the "Title Companies" in this Opinion.

In 2001, Prestige became an agent of Lawyers Title for the purpose of issuing title insurance commitments, title insurance policies, and closing protection letters ("CPLs") on behalf of Lawyers Title.  Prestige issued the CPLs using a form letter pre-signed by Fidelity.  Apart from its title insurance business, Prestige maintained escrow accounts on behalf of lenders for the purpose of holding and disbursing funds necessary to complete closings in the same real estate transactions in which Prestige acted as the title agent for

---

[6] This finding of core jurisdiction is undisputed.  *See* Pre-trial Order at 1 (Adv. Dkt. 100).  The United States Supreme Court in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), held that bankruptcy courts lack constitutional authority to enter a final judgment on a state-law, compulsory counterclaim that did not stem from the bankruptcy itself.  *See Technical Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399 (5th Cir. 2012) (suggesting a narrow interpretation of *Stern* in holding that *Stern* does not, *sub silentio*, reach so far as to render unconstitutional the statutory powers of federal magistrate judges).  In the event that a higher court disagrees that the Adversary involves "core" matters and/or otherwise determines that the Court lacks constitutional authority to enter a final judgment, the Court recommends that this Opinion be regarded as its proposed findings of fact and conclusions of law and further recommends that the District Court enter this Opinion as its own after due consideration, in accordance with 28 U.S.C. § 157(c)(1).

Lawyers Title.  The real estate closings at issue here took place in January and February 2009, only weeks after Lawyers Title was acquired by Fidelity in December 2008.

The Court pauses here to provide some context to the parties' dispute.  A title agent, like Prestige, in addition to issuing the policy on behalf of the title insurance underwriter, may close the underlying real estate transaction and act as the escrow agent for the lender involved.  The issuance of a title insurance policy and the closing of a transaction, however, are separate functions.

Title insurance is considered essential to some lenders in certain real estate closings.  *See* BARLOW BURKE, THE LAW OF TITLE INSURANCE § 2.02 (2012).  A title insurance policy insures the lender against the risk that the borrower does not actually have an interest in the collateralized real property or that other creditors have prior interests in the same property.  *Gibraltar Sav. v. Commonwealth Land Title Ins. Co*., 905 F.2d 1203, 1205 (8th Cir. 1990) (quotation omitted).  Another risk to the lender in real estate loan transactions is the loss of escrow funds.  To ameliorate that risk of loss in those real estate closings where the title agent also acts as the escrow agent, a lender may require the title insurance underwriter to issue a CPL in addition to the title insurance policy.  JOYCE PALOMER & KRISTY D. FREEMAN, TITLE INSURANCE LAW § 20:15 (2012-2013 ed.).  The CPL renders the title insurance underwriter contractually liable for any loss caused by the title agent's error, fraud, dishonesty, or failure to follow the lender's closing instructions in the transaction.[7]  *Metmor Fin. Inc. v. Commonwealth Land Title Ins. Co.*, 645 So. 2d 295, 297 (Ala. 1993) ("The purpose of the closing service letter is to

---

[7]The standard form developed by the American Land Title Association provides the same protection to borrowers as well as lenders on loans secured by residential property.  *See* James Bruce Davis, *The Law of Closing Protection Letters*, 36 TORT & INS. L.J. 845, 852 (2001).

provide indemnity against loss due to a closing attorney's defalcation or failure to follow a lender's closing instructions.").   In the absence of a CPL, a lender may have no recourse against a title insurance underwriter for losses caused by the fraud or misconduct of the title agent because escrow services ordinarily fall outside the scope of a title agent's actual or implied authority to act on behalf of the title insurance underwriter.  *See, e.g.*, *Johnson v. Robinson (In re Johnson)*, 292 B.R. 821, 829 (Bankr. E.D. Pa. 2003) (describing title agents as intermediaries who perform essentially ministerial administrative tasks associated with documenting the transaction).

If the underwriter reimburses the lender for an "actual loss incurred" by, for example, paying off the pre-existing lien that was supposed to be satisfied at the closing, the title insurance underwriter becomes subrogated to the rights available to the lender against the title agent.  *Sears Mortg. Corp. v. Rose*, 634 A.2d 74, 85-86 (N.J. 1993); *Client Security Funds of the Bar of N.J. v. Security Title & Guar. Co.*, 634 A.2d 90, 94 (N.J. 1993); James Bruce Davis, *The Law of Closing Protection Letters*, 36 TORT & INS. L.J. 845, 868 (2001).  "[A] subrogated insurer stands in the shoes of its insured, and takes no rights other than those that the insured had, and is subject to all defenses which the third party tort feasor might assert against the insured."  *Miss. Farm Bureau Cas. Ins. Co. v. Orme*, 422 F. Supp. 2d 685, 687 (S.D. Miss. 2006) (quoting *Ind. Lumbermen's Mut. Ins. Co. v. Curtis Mathes Mfg. Co.*, 456 So. 2d 750, 754 (Miss. 1984)).

Turning to the Adversary, the real estate closings at issue, as mentioned previously, took place in January and February 2009.  As to these closings, the lenders provided written closing instructions to the Title Companies regarding the disbursement of escrow funds.  The instructions required the Title Companies to pay all existing liens

of record on the subject real estate before releasing the liens. The CPLs issued on Fidelity's behalf in these real estate transactions rendered Fidelity liable to a "lessee or purchaser of an interest in land or a lender secured by a mortgage . . . of an interest in land . . . for actual loss incurred . . . in connection with [a real estate transaction] . . . when such loss arises out of . . . [f]raud or dishonesty of [the Title Companies] in handling . . . funds or documents in connection with" a real estate closing. (Pl. Ex. 132).[8]

After reviewing the Title Companies' escrow accounts on February 6, 2009, Fidelity canceled its agency agreements with the Title Companies. Fidelity discovered in its forensic audit that in many of the real estate transactions handled by the Title Companies, the Title Companies had released liens without paying existing lienholders. Fidelity paid forty-five (45) claims totaling $4,904,627.37 asserted by lenders and borrowers against Fidelity under the indemnity provisions of the CPLs or under state law. (Pl. Ex. 199). Fidelity seeks to recover this amount, plus its attorneys' fees, from Colson by subrogation and assignment based on Colson's breach of fiduciary duty to the lenders and other state-law grounds. In addition, Fidelity asks the Court to declare the entire debt nondischargeable under bankruptcy law.

---

[8] The exhibits introduced into evidence at Trial by Fidelity are cited as "(Pl. Ex. ____)", and the page number or the Bates stamp is provided when available. Citations to the exhibits introduced into evidence at Trial by Colson require some explanation because they were not labeled as set forth by the Pre-trial Order. Colson divided the exhibits into two (2) binders and in each binder separated the exhibits with tabs labeled by subject matter. The tabs cited in this Opinion are "QAR," "CULUMBER," "LANDAMERICA," and "E-MAILS." Most of the exhibits also include the source of the document and a Bates stamp. Colson's exhibits in the first binder are cited as "(1 [TAB NAME] ____)" and in the second binder, "(2 [TAB NAME] ____)". The source of the document and either the page number or Bates stamp follows the name of the tab when available.

FACTS[9]

1.     Colson graduated with a Juris Doctor degree from the Paul M. Hebert Law Center at Louisiana State University ("LSU") in 1992.  (Pl. Ex. 100).  That same year, Colson became a licensed attorney in the state of Mississippi.[10]

2.     After graduation, Colson joined the law firm of Mize, Blass, Lenoir and Laird ("Mize Blass") in Gulfport, Mississippi.  (4 Trial Tr. at 17-19).[11]  While an associate at Mize Blass, Colson practiced real estate law.  (*Id.* at 6).

3.     In 1997, Colson left Mize Blass to form his own real estate law firm in Gulfport, Mississippi.  (4 Trial Tr. at 7, 20-21, 110).

**Prestige**

4.     In 1998, Colson formed Prestige, a Mississippi corporation with its principal place of business in Gulfport, Mississippi.[12]  Until 2008, Colson was the sole officer and shareholder of Prestige and in that capacity exercised complete control over Prestige.  (Pl. Ex. 100; 4 Trial Tr. at 28).

---

[9] Specifically, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052 without regard to which section of the Opinion they are found.

[10] On October 6, 2009, for reasons discussed later, Colson was suspended from the practice of law by The Mississippi Bar.

[11] The transcript of the Trial consists of five (5) volumes, one (1) volume for each of the first five (5) days of Trial.  The first transcript, which is a record of the first day of the Trial on January 14, is cited as "(1 Trial Tr. at ____)" (Adv. Dkt. 105); the second transcript, which is a record of the second day of the Trial on January 15, is cited as "(2 Trial Tr. at ____)" (Adv. Dkt. 106); and so on with the transcripts from the third day on January 16 (Adv. Dkt. 108), the fourth day on January 28 (Adv. Dkt. 112), and the fifth day on January 29 (Adv. Dkt. 113). There is no transcript for the last day of the Trial on August 20.

[12] After Hurricane Katrina in 2005, Colson moved the main office to the adjacent city of Biloxi, Mississippi.  (Swanzy Dep. at 15-16).

5.     The offices of Prestige "regularly participated in real estate closings and were also engaged as title agents." (Pl. Ex. 130 at 1). Like many other title insurance companies, Prestige "issue[d] title insurance to protect the buyer's and lender's interests in real estate transactions[,] . . . received funds from the lenders[,] and w[as] charged with distributing the funds in accordance with the loan closing documents." (*Id.*). Prestige "establish[ed] . . . escrow account[s] to process the closing transactions." (*Id.*).

**Prestige Agency Agreement**

6.     On May 15, 2001, Prestige entered into a "Title Insurance Agency Agreement" (the "Prestige Agency Agreement") in which Lawyers Title appointed Prestige as "its agent solely for the purpose of issuing, on [Lawyers Title's] forms, title insurance commitments, policies and endorsements on real estate located in: the State of Mississippi." (Pl. Ex. 99 at 1). Colson estimated that Prestige had about seven (7) branch offices at this time. (4 Trial Tr. at 17).

**Commissions**

7.     Under the Prestige Agency Agreement, Prestige retained 70 percent of each policy premium as a commission and paid the remaining 30 percent of the premium to Lawyers Title. (Pl. Ex. 99 at 1, Add. No. 1). The Prestige Agency Agreement was later amended, effective January 1, 2003, to increase the commission earned by Prestige to "eighty percent (80%) of each title insurance policy premium." (Pl. Ex. 99, Add. No. 2).

8.     Once Prestige received fees for the issuance of a title insurance policy, Lawyers Title was "deemed the owner of the entire amount thereof and [Prestige was to]

. . . hold and maintain such Premiums, as trustee for [Lawyers Title], strictly in accordance with the terms" of the Prestige Agency Agreement.  (Pl. Ex. 99 at 2).

**Escrow Services**

9.      With respect to closings and escrow services performed by Prestige, the Prestige Agency Agreement charged Prestige with "[k]eep[ing] all funds, received by [Prestige] from any source in connection with transactions in which title insurance policies of [Lawyers Title] are to be issued, in a federally insured financial institution, *in an account separate from [Prestige's] individual accounts and designated as an 'escrow' . . . account, and disburse such funds only for the purposes for which the same were entrusted*."  (Pl. Ex. 99 at 2) (emphasis added).

10.      The parties agreed that Prestige's escrow business was beyond the scope of the Prestige Agency Agreement, but that "Prestige [would] permit [Lawyers Title] to audit and examine all financial and business records relating to any escrow business conducted by [Prestige] at any reasonable time or times due to [Lawyers Title's] legitimate concerns about Closing Protection Letter liability and title insurance policy liability created by [Prestige's] closing services."  (Pl. Ex. 99 at 3).

11.      The Prestige Agency Agreement authorized Prestige to issue CPLs, under which Lawyers Title was liable for any loss caused by Prestige's failure to adhere to the lender's closing instructions.  (1 Trial Tr. at 62).

12.      Lawyers Title could terminate the Prestige Agency Agreement immediately upon written notice to Prestige if Prestige engaged in any of the following conduct:

    a.      Commits a breach of any term, condition or any representation
            contained in this Agreement;

b.      Exercises, or attempts to exercise, any authority in conflict with this Agreement;

c.      Commits any act of fraud or misconduct, or becomes insolvent . . .;

. . .

i.      Fails to cooperate and comply with [Lawyers Title] in the performance of quality assurance reviews, audits and other examination of [Prestige's] activities.

(Pl. Ex. 99 at 4).

13.     The Prestige Agency Agreement rendered Prestige liable to Lawyers Title, against any losses "sustained or incurred by [Lawyers Title] and arising from the fraud, negligence or misconduct of [Prestige], or any agent, servant or employee of [Prestige]." (Pl. Ex. 99 at 4).

14.     After entering into the Prestige Agency Agreement, Prestige's business grew significantly as the result of a refinancing boon.  On February 1, 2005, Prestige and Lawyers Title entered into a second "Title Insurance Agency Agreement" that was substantially identical to the first Prestige Agency Agreement, except that it expanded Prestige's territory to include the State of Alabama (with the exception of Mobile and Tuscaloosa Counties).  (Pl. Ex. 99; 2 Trial Tr. at 22).

15.     Later, Prestige and Lawyers Title again amended the Prestige Agency Agreement to expand Prestige's territory to include Florida and Louisiana.  (2 Trial. Tr. 34-35).

**Advanced Title**

16.     During the period of Prestige's expansion in 2005, Colson entered into a joint venture with Sandion, a Texas General Partnership d/b/a Coldwell Bankers Realty Company ("Sandion"), to form Advanced Title.  (4 Trial. Tr. at 27).

17.     Advanced Title was a limited liability company.  Sandion and Prestige were the sole members of Advanced Title.  Although Sandion owned 51 percent of the stock in Advanced Title, and Prestige owned only 49 percent, Prestige was the managing member of Advanced Title.  (Pl. Ex. 201).

18.     On October 1, 2006, Advanced Title entered into a "Title Insurance Agency Agreement" (the "Advanced Title Agency Agreement") with Lawyers Title "for the purpose of issuing, on [Lawyers' Title] forms, title insurance commitments, policies and endorsements on real estate located in the State of Mississippi."  (Pl. Ex. 99, Ex. C).

19.     The terms of the Advanced Title Agency Agreement are nearly identical to those in the Prestige Agency Agreement, as previously outlined.  (Pl. Ex. 99, Ex. D). On November 1, 2006, the parties entered into another "Title Insurance Agency Agreement" that was substantially identical to the first Advanced Title Agency Agreement except that it expanded Advanced Title's territory to include the State of Alabama (with the exception of Tuscaloosa County).  (*Id.*).  Later, the parties entered into a similar agency agreement covering the state of Florida.

**Bank Accounts**

20.     Prestige's principal place of business moved to Biloxi, Mississippi, in 2005.  By the end of 2008 and early 2009, Prestige and Advanced Title had eleven (11) branch offices in four (4) states, including:  five (5) offices in <u>Mississippi</u> (Gulfport,

Hattiesburg, Jackson, Tupelo, Southaven); two (2) offices in <u>Alabama</u> (Mobile, Daphne); two (2) offices in <u>Florida</u> (Destin and Pensacola); and two (2) offices in <u>Louisiana</u> (Metairie and Baton Rouge).  (Dep. of Swanzy at 16).  In this Opinion, the branch offices sometimes are referred to by the city in which they were located.  For example, the branch office in Gulfport, Mississippi, is referred to simply as the "Gulfport Office."

21.     According to Colson, Prestige and Advanced Title at their peak employed approximately 85 employees and conducted an average of 850 closings per month.  (4 Trial Tr. at 18).  To conduct his title business, Colson maintained more than 100 accounts at various banks, including Regions Bank ("Regions") and Wachovia Bank ("Wachovia").

22.     The Title Companies each maintained a master funding account, an operating account, and an agency account.  (4 Trial Tr. at 8).  Also, they each maintained an escrow account and an abstract account for each branch office.  In 2008 and 2009, these accounts were held at Wachovia and Regions and sometimes are referred to by the name of the branch office.  For example, the escrow account associated with the Gulfport Office is referred to as the "Gulfport Escrow Account."  With some exceptions, the escrow accounts were maintained centrally in Mississippi.

23.     Colson himself authorized almost all transfers of funds to and from the accounts.  Most of the transfers at issue in the Adversary involve the accounts at Wachovia.

**Regions Funding Account**

24.     In 2006, Prestige's master funding account was located in Mississippi at Regions[13] (the "Regions Funding Account") (2 Trial Tr. at 139).  All escrow funds related to real estate loan transactions, regardless of the location of the branch office where the closing was scheduled to take place, were wired into the Regions Funding Account with few exceptions.  (Pl. Ex. 130 at 1).  Likewise, escrow funds paid by paper check were deposited into the Regions Funding Account.  Funds from the Regions Funding Account then were wired into the escrow account maintained for the branch office where the real estate loan closing was scheduled to take place.  (*Id.* at 5).  The transfer of funds into the escrow account usually did not occur until the day of the closing, regardless of when the funds were deposited by the lender or financial institution into the Regions Funding Account.  Generally, Colson himself verified when deposits were made and available for withdrawal from the Regions Funding Account to the escrow account for disbursement in a closing.  (Houston Dep. at 40).  The escrow funds then were disbursed from the account for that branch office supposedly in accordance with the lender's closing instructions and the HUD-1 settlement statements ("HUD-1")[14]

**Wachovia Funding Account**

25.     For reasons explained later, in 2007, Colson moved most of the accounts, including the master funding account, from Regions to Wachovia.  The new Wachovia

---

[13] Regions and AmSouth Bank merged in late 2006.  Prior to the merger, Prestige's accounts were maintained at AmSouth.  To avoid confusion, the Court refers only to Regions.

[14] HUD-1 is a statement of actual charges and adjustments paid by the borrower and the seller in a closing that involves residential property.  HUD-1 is required under the Real Estate Procedure Act, 12 U.S.C. § 2601 *et seq*., and 24 C.F.R. § 3500 (Regulation X) promulgated by the Department of Housing and Urban Development.

Funding Account operated in the same way as the Regions Funding Account except that the Wachovia Funding Account had a "sweep" feature. (2 Trial Tr. at 139). Any monies that remained in an office escrow account at the end of the day were "swept" into the Wachovia Funding Account. (*Id.*). By authorizing the "sweep" feature, Colson was able to accrue interest on the real estate closing funds at a higher rate. (1 Trial Tr. at 109).

### Operating Account

26.     At times, Colson transferred escrow funds from the Wachovia Funding Account to Prestige's operating account (the "Operating Account"). These funds were fees earned by Prestige in connection with escrow services performed by Prestige. (5 Trial Tr. at 38). At Trial, Colson testified that Prestige, and later Advanced Title, typically earned between $1,000.00 and $1,500.00 per closing. (4 Trial Tr. at 23). These fees, after being remitted to the Operating Account, were used to pay the various operating expenses of Prestige, the personal expenses of Colson, and the expenses of other companies owned by Colson.[15] (4 Trial. Tr. at 25, 27; Swanzy Dep. at 31).

27.     Unlike the escrow accounts, the Operating Account was not subject to being "swept" by the Wachovia Funding Account. (2 Trial Tr. at 197).

### Prestige Agency Account

28.     Colson deposited title insurance premiums paid by the lenders into the agency account (the "Prestige Agency Account"). (4 Trial. Tr. at 25). From the Prestige Agency Account, premium payments were remitted to Lawyers Title. (Swanzy Dep. at 137).

---

[15] In addition to the Title Companies, Colson owned several other businesses, including Prestige Sports Management, Inc. ("Prestige Sports"). (Swanzy Dep. at 13).

**Prestige Abstract Account**

29.     A separate abstract account (the "Prestige Abstract Account") was opened for each branch office.  Escrow funds were routinely transferred from the Wachovia Funding Account directly into the Prestige Abstract Account, initially for the purpose of "pay[ing] abstractors . . . [for] run[ning] the title work."  (4 Trial Tr. at 24).

**Escrow Accounts**

30.     As with the Prestige Abstract Accounts, separate escrow accounts were opened for each branch office.  (4 Trial Tr. at 21).  Escrow funds were transferred from the Wachovia Funding Account to the escrow accounts just before a closing was expected to take place.  The escrow accounts were "zero balance accounts" ("ZBAs"). When monies remained in the escrow account at the end of the day, either because the closing did not occur as scheduled, because the borrower changed his mind, or because of some other reason, the monies were "swept" back into the Wachovia Funding Account. (2 Trial Tr. at 139).

**Blakeslee & Blakeslee**

31.     In 1998, Colson retained Blakeslee & Blakeslee, P.A. ("Blakeslee & Blakeslee"), an accounting firm in Gulfport, to reconcile some of Prestige's accounts.  (4 Trial Tr. at 35).

32.     The reconciliations performed by Blakeslee & Blakeslee were "two-way" reconciliations and did not include all of Prestige's accounts.  (4 Trial Tr. at 53).  The "two-way" reconciliation process involves "a typical accounting reconciliation between the book and the bank activity."  (1 Trial Tr. at 94).  Notably, Blakeslee & Blakeslee never reconciled the Regions Funding Account and was never asked by Colson to do so.

33.     In 2003, Colson ended Blakeslee & Blakeslee's accounting services, based upon Lawyers Title's recommendation, after Colson learned that Blakeslee & Blakeslee could not perform "three-way" reconciliations.  A "three-way" reconciliation adds a step to the traditional "two-way" reconciliation process.  (1 Trial Tr. at 94).  In a "two-way" reconciliation, the balances of internal records are reconciled against bank statements. The "three-way" reconciliation process requires reconciliation of the individual balances of each real estate transaction.  (*Id.*)  That balance is then reconciled against the balances of internal records and bank statements.

34.     Colson agreed with Lawyers Title to bring most of the accounting duties in-house.  From 2003 through 2009, he was assisted in handling the financial affairs of the Title Companies by three key employees, Wendell Cavalier ("Cavalier") (2003-2006), Swanzy (2006-2009), and Houston (2007-2009), and by an outside accountant, Culumber (2006-2009).

**Cavalier**

35.     Cavalier was hired by Colson as chief financial officer of Prestige in 2003, after Colson ended the accounting services provided by Blakeslee & Blakeslee.  From 2003 until May 2006, Cavalier was responsible for paying bills and reconciling the accounts.  (Swanzy Dep. at 16).

**Swanzy**

36.     Swanzy was hired by Colson in 2004 to perform work for Prestige Sports, Colson's sports management company.  She worked in Prestige's main office with Colson.  Although Prestige Sports was wholly unrelated to the title insurance business, Prestige paid Swanzy's wages.  (Swanzy Dep. at 13-15).  Swanzy eventually became

Colson's personal assistant until May 2006, when her duties again changed.  (Swanzy Dep. at 14).

37.     After Cavalier left Prestige in May 2006, Swanzy began performing some of his accounting duties.  She paid the bills for Prestige, and later for Advanced Title, for Colson's other businesses, and for Colson himself.  (Swanzy Dep. at 18-19).  Swanzy's job duties, however, did not include transferring funds among the accounts.

38.     Colson told Swanzy which bills to pay, when to pay them, and from which account to pay them.  Often, Colson told Swanzy to pay bills from the Abstract Account.

**Culumber**

39.     Sometime in 2006, Colson hired Culumber and his accounting firm, Culumber, Harvey & Associates, to reconcile the Prestige Operating Account, to pay the payroll and other expenses of Prestige from the Prestige Operating Account, and to prepare tax returns for Colson and his companies.[16]  (5 Trial Tr. at 21).

40.     Culumber designated payments made from the Prestige Operating Account to Colson, or to other businesses owned by Colson, as "loans."  (2 Trial Tr. at 169).  Culumber then reported these loans as income to Colson for tax purposes.[17]

41.     Colson arranged for Swanzy to deliver bank statements of the Prestige Operating Account to Culumber each month.  (Swanzy Dep. at 135).  Culumber knew

---

[16] Culumber also performed these same accounting services for two other entities owned by Colson, Vic's Chophouse of Mississippi, LLC ("Vic's Chophouse"), and Red Eye Grill (5 Trial Tr. at 76).  Although Culumber purportedly prepared tax returns for Colson, the Internal Revenue Service ("IRS") was unable to locate filed returns for the years 2005 through 2008.

[17] Because Prestige was a subchapter "S" corporation, net income flowed through Colson, who was supposed to report the loans as income on his individual tax returns.  (5 Trial Tr. at 79).

about, but did not reconcile, the escrow accounts and did not know about the Abstract Account.

**Houston**

42.     Houston, a licensed Florida title insurance agent, began working for Prestige in the Destin Office in 2004.  (Houston Dep. at 18).  In 2007, Houston began "three-way" reconciling the Destin Escrow Account using "SoftPro," a real estate closing and title insurance software program.  Houston so impressed Colson with her self-initiative that he asked her to undertake responsibility for "three-way" reconciling all of the escrow accounts for all of the branch offices.  Houston's new duties required her to monitor all the escrow accounts using SoftPro.  (Houston Dep. at 10, 19).  Houston began communicating daily with Colson in Mississippi from the Destin Office.  On occasion, she stepped into Colson's shoes when he was unavailable to notify employees in branch offices when funds were available and ready for disbursement in closings.

43.     In connection with Houston's new responsibilities to "three-way" reconcile the escrow accounts, Houston received from the main office about eighteen (18) boxes of bank statements, which were disorganized and in disarray.  Houston considered the "three-way" reconciliation of the escrow accounts in all past real estate closings to be a monumental task and was never able to finish that project.

44.     Also in connection with Houston's new duties, Houston received bank statements each month for the Wachovia Funding Account and all the escrow accounts, which Swanzy mailed to her from the main office in Biloxi.  (Houston Dep. at 39).  (The bank statements of the Destin Escrow Account were already mailed directly to Houston.) (*Id.*).  Therefore, with respect to the escrow accounts, all of Prestige's records were held

in the Destin Office, although the main office of the Title Companies where Colson worked was located in Biloxi.

45.     In addition to "three-way" reconciling the individual office escrow accounts, Houston trained other employees on SoftPro.  (Houston Dep. at 42).

46.     Although Houston received bank statements from the Wachovia Funding Account, she did not attempt to reconcile the Wachovia Funding Account.  This meant that the Wachovia Funding Account was not being maintained in SoftPro.

47.     Colson testified at Trial that Houston's reconciliations of the branch office escrow accounts using SoftPro were being supervised by Culumber.  (4 Trial Tr. at 167). Culumber, however, contradicted Colson and testified that he did not know Houston and had no knowledge of SoftPro.  (5 Trial Tr. at 70).

48.     In summary, the Wachovia Funding Account and the Abstract Account were not being reconciled at all.  The escrow accounts were being reconciled three (3) different ways by Houston beginning in 2007, but only as to ongoing real estate transactions.

**QARs**

49.     Throughout its relationship with the Title Companies, Lawyers Title periodically conducted "Quality Assurance Reviews" ("QARs") of Prestige and later Advanced Title.[18]  (*See, e.g.,* 2 QAR LandAmerica 000294).

50.     The purpose of the QAR process, as described in a letter from Lawyers Title to Colson, was "to provide an insightful and thoughtful evaluation of an agency's

---

[18]     QARs were conducted by LandAmerica Financial Group, Inc. ("LandAmerica").  (*See, e.g.,* 2 QAR LandAmerica 000294).  Lawyers Title was a subsidiary of LandAmerica.  (1 Trial Tr. at 151).  For the sake of simplicity and because it is immaterial to the issues at Trial, LandAmerica is simply referred to as Lawyers Title.

practices and procedures, with particular emphasis on those areas that, in [Lawyers Title's] experience, carry the greatest potential for loss. . . . [The QAR process] focused on three primary areas—underwriting, a policy audit, and an escrow reconciliation review." (2 QAR LandAmerica 000188).

51.     Both the Prestige Agency Agreement and the Advanced Title Agency Agreement required Prestige to "cooperate fully with [Lawyers Title] in the performance of quality assurance reviews, audits and other examinations of [Prestige's] activities." (Pl. Ex. 99 at 3).

52.     Before the QAR, Lawyers Title notified Prestige and Advanced Title when and where it planned to conduct the QAR and asked Colson to provide documents and certain information in advance of their visit. After the QAR, Lawyers Title issued a report summarizing the items reviewed, identifying any areas of concern, and recommending any necessary changes.

53.     Colson appeared to cooperate fully with Lawyers Title in providing access to the information it requested during the QARs. A chain of emails between Goodwin, a Lawyers Title employee who was involved in the QAR process, and Colson demonstrate a relaxed, friendly rapport. In an email dated May 1, 2007, from Colson to Goodwin, Colson writes:

> Again, I am confident that Kathy [Sutton] will learn that we will have a great audit all around. I may burst . . . . I am so ready!!! Two questions remain, where are we going for steaks and how much will LSU and Auburn beat Alabama by? We will definitely have some cold drinks at the Grand Hotel . . . . several!!

(1 E-MAILS 567).

54.     Colson alleges that the QARs show that Lawyers Title was fully aware of the structure of his escrow accounts, including the "sweep" feature of the funding account, and yet Lawyers Title never attempted to terminate the Prestige Agency Agreement.  Because Colson relies upon the QARs as a defense to Fidelity's claims against him, the QARs conducted in 2002, 2003, 2007, and 2008 are discussed in some detail.   The final QAR, which was conducted in February 2009, resulted in the cancellation by Fidelity of its agency agreements with the Title Companies, and is discussed later in this Opinion.

**2002 QAR**

55.     During the QAR in 2002 (the "2002 QAR"), Lawyers Title discovered large negative adjusted balances in several of the individual office escrow accounts.  (2 RE LandAmerica 000299; 2 QAR LandAmerica 000294 & 000322).  It also discovered that the escrow accounts were not being "three-way" reconciled.

56.     Lawyers Title recommended that Prestige purchase SoftPro for each of its branch offices to manage and "three-way" reconcile its escrow accounts.  (2 QAR LandAmerica 000322; 4 Trial Tr. at 36).  Because many of the individual office escrow accounts had large negative adjusted balances, Lawyers Title recommended that Prestige close its existing accounts and open new accounts after implementing SoftPro.

57.     Lawyers Title also advised Prestige that it should continue to use its current individual office escrow accounts until all checks deposited into those accounts had cleared the bank.  (2 QAR LandAmerica 000323-000326).

58.     Additionally, Lawyers Title recommended that an employee of Prestige review all bank statements before mailing them to Blakeslee & Blakeslee and eventually

make that employee responsible for timely reconciliations. (2 QAR LandAmerica 000295).

59.     Kathy Sutton ("Sutton"), an employee of Lawyers Title who conducted the 2002 QAR, indicated in an email to others at Lawyers Title that Prestige intended to bring the reconciliation process in-house, rather than continue to pay Blakeslee & Blakeslee to reconcile its accounts once SoftPro was implemented. (1 E-MAILS LandAmerica 000248).

60.     In the summer of 2002, Lawyers Title performed a follow-up review that confirmed Prestige's compliance with Lawyers Title's instructions, including its implementation of SoftPro in each of its offices. (2 QAR LandAmerica 000329). At this time, every branch office had access to SoftPro. (Houston Dep. at 33).

61.     The follow-up review in 2003 also mentioned that Colson had opened new escrow accounts for each of the Prestige offices at Whitney Bank, Bancorp South, AmSouth Bank, and Regions Bank. (2 QAR LandAmerica 000451).

**2003 QAR**

62.     Although Colson opened new escrow accounts, as of February 2003, Prestige was still using the Regions Funding Account as "a central wire transfer account for all of [its] offices." (2 QAR LandAmerica 000450). During a QAR conducted at several of the Prestige offices in 2003 (the "2003 QAR"), Lawyers Title again advised Colson to cease using the Regions Funding Account immediately but close it when all remaining items had cleared the account. (*Id.*).

63.     After Prestige opened new individual office escrow accounts, Lawyers Title observed during the 2003 QAR, that Prestige was not "three-way" reconciling all of

the escrow accounts.  While some of the new offices' escrow accounts were "three-way" reconciled, others were only partially reconciled, and others still were not reconciled at all.  (2 RE LandAmerica 000645).

**2007 QAR**

64.    A QAR of the various offices of Prestige and Advanced Title in Mississippi and Louisiana was conducted during May 2007 (the "2007 QAR").  (2 QAR Fidelity 000441).  Given her new accounting responsibilities, Houston worked closely with Lawyers Title during the 2007 QAR.  (Houston Dep. at 48-49).

65.    The 2007 QAR confirmed that Colson had opened a new funding account at Hancock Bank (the "Hancock Funding Account").  (2 QAR Fidelity 000443).  The Hancock Funding Account operated in the same manner as the Regions Funding Account.

66.    As to the Hancock Funding Account, the 2007 QAR noted that it was not being maintained in SoftPro and not being reconciled.  "If you wish to maintain a wire account, please note that this account must be 3-way reconciled on a monthly basis."  (2 QAR Fidelity 000443).

67.    By happenstance, Culumber was present when the 2007 QAR took place in the main office in Biloxi.  (5 Trial Tr. at 23).  Culumber testified that Sutton of Lawyers Title showed no interest in the Prestige Operating Account but focused her attention solely on the bank statements from the escrow accounts.  He recalled that Sutton discussed with him the necessity of "three-way" reconciling the escrow accounts. Because his job duties included only the Prestige Operating Account, however, he did not view this casual conversation as a directive from Colson to perform this task.

68.     The 2007 QAR revealed that many of the individual office escrow accounts were not being reconciled properly. (1 Trial Tr. at 120-21). Lawyers Title once again encouraged Colson to close a majority of the individual office escrow accounts and open new accounts. (2 QAR Fidelity 000439 & 000442).

69.     The Wachovia Funding Account was opened on August 24, 2007, with a $100.00 deposit. (5 Trial Tr. at 102). There was no significant activity in the Wachovia Funding Account until September 12, 2008. (*Id.* at 125). The Wachovia Funding Account operated in the same manner as the Regions Funding Account and the Hancock Funding Account, with the exception of the "sweep" feature, as mentioned previously.

70.     During the months of August, September, and October 2007, many new escrow accounts were opened at Wachovia. (2 QAR Fidelity 000439; 5 Trial Tr. at 124). The Operating Account was closed and reopened at Wachovia at this same time.

71.     Individual office escrow accounts were not opened at Wachovia for all of the offices of Prestige and Advanced Title. (Swanzy Dep. at 27; 2 QAR Fidelity 000439-000440). For example, the Tupelo Office and the Metairie Office maintained their escrow accounts at Regions because there was no Wachovia branch nearby. (*Id.*).

72.     As the new escrow accounts were opened, the old escrow accounts were allowed to wind down.

73.     There was no evidence presented at Trial that funds held in the old escrow accounts were transferred into the new escrow accounts. (5 Trial Tr. at 124).

74.     By December 10, 2007, the Wachovia Funding Account was overdrawn, although it was opened less than four (4) months previously. (5 Trial Tr. at 102). During

the rest of the month of December 2007, the Wachovia Funding Account was overdrawn on six (6) separate occasions.  (*Id.*).

**2008 QAR**

75.     Around March 2008, Lawyers Title conducted another QAR of the Title Companies ("2008 QAR") (1 QAR Fidelity 000438).

76.     The purpose of the 2008 QAR was to confirm implementation of Lawyer Title's recommendations from the 2007 QAR and to address issues that may have arisen from "three-way" reconciling the new office escrow accounts opened at Lawyers Title's request after the 2007 QAR.  (1 E-MAILS 247-48).

77.     During the 2008 QAR, Lawyers Title confirmed that the new escrow accounts had been "three-way" reconciled through February 2008.  Also, Lawyers Title "found no priority issues warranting your immediate attention." (1 QAR Fidelity 000438).  The 2008 QAR was the last QAR conducted by Lawyer Title.  Fidelity purchased Lawyers Title before the end of that same year on December 22, 2008. Approximately eight (8) months later, Fidelity ended its agency agreements with Prestige and Advanced Title after conducting its own final QAR.

**Third-Party Deposits into the Wachovia Funding Account**

78.     In 2007 and early 2008, large deposits were made into the Wachovia Funding Account that were wholly unrelated to escrow services.  As a result, escrow funds intended for disbursement in real estate closings were commingled with other funds.  These deposits, totaling approximately $7.46 million, can be divided into two categories, investments funds and viatical settlement funds.

**Investment Funds**

79.     In 2007, Colson approached Ted A. Martin ("Martin") about investing in Prestige.  (4 Trial Tr. at 27).  Colson knew Martin through the LSU Alumni Association.

80.     In connection with Martin's investment, Chaffe & Associates in New Orleans, Louisiana valued Prestige at $4.5 million as of October 31, 2007.  (4 Trial Tr. at 28).

81.     On January 3, 2008, Martin and Colson signed a Stock Purchase Agreement for the acquisition by Martin of 49 percent of the outstanding shares of Prestige.  (10-05005-NPO, Adv. Dkt. 1, Ex. D).  That same day, Martin loaned Colson $2,000,000.00 in advance of the closing on the sale of the stock.  At the closing that took place on March 31, 2008, Colson conveyed 490 shares of common stock of Prestige to Martin in return for Martin's cancellation of the promissory note that Colson previously signed in connection with the $2 million advance.  (4 Trial Tr. at 28).  According to Colson, Martin's investment was to pay for the expansion of Advanced Title in Texas, as well as for his own personal use.  (*Id.*).

82.     The bank records do not show a single deposit of $2 million in January 2008, although there were nine (9) deposits made by "Stephen Colson" into the Wachovia Funding Account during the first weeks of January 2008 that may have originated from Martin's $2 million investment in Prestige.  Specifically, there were seven (7) deposits on January 3, 2008; one (1) deposit on January 7, 2008; and one (1) deposit on January 9, 2008, which altogether totaled approximately $1,860,000.00.  (5 Trial Tr. at 106).

83.     These deposits did not remain in the Wachovia Funding Account for long because by January 11, 2008, the Funding Account was overdrawn.  (5 Trial Tr. at 106). After Martin's investment in Prestige, Colson began paying his personal bills and the expenses of his other companies from the Abstract Account.  (*Id.*; Pl. Ex. 200).  For example, from January 2008 to January 2009, Colson transferred $183,000.00 from the Abstract Account to pay the bills of Vic's Chophouse, a restaurant owned by Colson.  (2 Trial Tr. at 177, 207).

84.     In a separate adversary proceeding initiated almost one (1) year later on February 8, 2010, Martin sued Colson for the return of his investment.  (10-05005-NPO, Adv. Dkt. 1).  A Consent Judgment (10-05005-NPO, Adv. Dkt. 125) was entered on June 1, 2011, which rescinded Martin's purchase of stock and awarded Martin $2 million in damages.  In addition, the debt was excepted from Colson's discharge.

**Viatical Settlement Funds**

85.     In early 2008, Colson entered into an escrow management services agreement with A&O Bonded Life Assets Management, LLC ("A&O"), a viatical settlement company,[19] to serve as its agent for handling investment funds.  (4 Trial Tr. at 20).

---

[19]     A&O had numerous affiliated companies who were also parties to the agreement.  A viatical settlement is "[a] transaction in which a terminally or chronically ill person sells the benefits of a life-insurance policy to a third party in return for a lump-sum cash payment equal to a percentage of the policy's face value."  BLACK'S LAW DICTIONARY 1497 (9th ed. 2009).  In other words, a terminally ill individual (generally, an individual who has less than two (2) years to live) sells the right to receive death benefits under his life insurance policy to a viatical settlement company.  The terminally ill individual, in his final months, enjoys some financial stability as a result of the lump-sum payment, which is generally a percentage of the value of the death benefits, and the viatical settlement company receives a profit.  (Test. of Ingram, 2 Trial Tr. at 142).

86.     A&O paid Prestige a one-time fee of $150,000.00, for which he agreed to pay the periodic premiums on life insurance policies as they became due.  (2 Trial Tr. at 143).

87.     Although the viatical settlement funds were wholly unrelated to Prestige, funds for paying life insurance premiums in accordance with Colson's agreement with A&O in the amount of $4.6 million were deposited into the Wachovia Funding Account on February 29, 2008.  (2 Trial Tr. at 143).  Another $1 million in life insurance premiums was deposited into the Wachovia Funding Account in May 2008.  (2 Trial Tr. at 154).

88.     Prior to the deposit of the life insurance premiums into the Wachovia Funding Account, the account was overdrawn.  (2 Trial Tr. at 145).

89.     After the life insurance premiums were deposited into the Wachovia Funding Account, they were transferred into an account ending in "7026" and titled "Houston AO 2 Checking" (the "Life Premiums Account") that was held at Wachovia. (2 Trial Tr. at 144; Pl. Ex. 130 at 3).

**Bankruptcy of LandAmerica**

90.     On November 26, 2008, LandAmerica filed a petition for relief under chapter 11 of the Code in Case No. 08-35994-KRH in the Richmond Division of the Eastern District of Virginia.  (1 Trial Tr. at 151; 4 Trial Tr. at 77).

91.     Immediately after LandAmerica filed its petition for relief under the Code, the title insurance business of Prestige and Advanced Title ceased operations for approximately two (2) weeks because no lender would accept Lawyers Title's CPLs.  (4 Trial Tr. at 77).

92.    On December 22, 2008, Fidelity acquired Lawyers Title from LandAmerica as part of a stock purchase agreement approved by the Virginia bankruptcy court.[20]  (1 Trial Tr. at 151; 4 Trial Tr. at 77).  Prestige and Advanced Title resumed their title business with Fidelity.

**Overdrawn Accounts**

93.    Despite the earlier deposits of funds unrelated to real-estate closings in the approximate amount of $7.46 million, consisting of Martin's investment funds and the viatical settlement funds, the Wachovia Funding Account was once again overdrawn on September 4, 2008.  (5 Trial Tr. at 111).  In the ensuing months from October 2008, until February 10, 2009, the Wachovia Funding Account continued to be overdrawn on numerous days.  (*Id.*).  Specifically, the Wachovia Funding Account was overdrawn on seven (7) days in October 2008, five (5) days in November 2008; nine (9) days in December 2008, ten (10) days in January 2009; and two (2) days in February 2009.  (Pl. Ex. 118, Excerpt B).  On many of the days that the Wachovia Funding Account was overdrawn, funds were transferred out of the Wachovia Funding Account.

94.    On October 20, 2008, when the Wachovia Funding Account had less than a balance of zero (0), Colson transferred $100,000.00 from the Wachovia Funding Account to the Abstract Account (Pl. Ex. 61 at Wachovia 003404) and, on that same day, transferred $100,000.00 from the Abstract Account to Colson's individual retirement account at Morgan Keegan (4 Trial Tr. at 181; Pl. Ex. 61 at Wachovia 003410).

---

[20] Perry testified at Trial that when Fidelity purchased Lawyers Title, Fidelity received a "massive transfer of information."  (2 Trial at 109-10).  Perry explained that some agency agreements and addendums were lost during this transfer.  (*Id.* at 110).  Perry testified that he was confident that Lawyers Title had an agreement with Prestige to issue title commitments, policies, and endorsements in Louisiana and Florida and with Advanced Title to issue title commitments, policies, and endorsements in Florida.  (*Id.*).  Perry believes these documents were lost during this transfer.  (*Id.*).

**November 2008**

95.     In November 2008, Colson withdrew $368,467.70 from the Wachovia Funding Account and deposited those funds into the Abstract Account.  Because the Title Companies had ceased operations for two (2) weeks after the commencement of LandAmerica's bankruptcy case, the source of these funds could not have been new loan closings.  (Pl. Ex. 61).

96.     Of all deposits made in November 2008, into the Abstract Account, 89.9 percent were from the Wachovia Funding Account.  (2 Trial Tr. at 175).

**December 2008**

97.     During the next month, the Wachovia Funding Account was overdrawn on December 2, 4, 5, 9, 11, 23, 24, 26, and 29.  (Pl. Ex. 118, Excerpt B).  Nevertheless, on four (4) of these dates, Colson transferred $182,109.07 from the Wachovia Funding Account into the Abstract Account, as shown in the following chart:

| Abstract Account | |
| --- | --- |
| December 4, 2008 | $30,000.00 |
| December 5, 2008 | $65,000.00 |
| December 11, 2008 | $32,109.07 |
| December 23, 2008 | $55,000.00 |

(Pl. Ex. 61, Wachovia 003379, 003379, 003380, & 003383).

98.     Of the funds deposited in December 2008 into the Abstract Account, 91.7 percent were withdrawn from the Wachovia Funding Account.  (2 Trial Tr. at 175).

99.     The amount of money deposited into the Abstract Account during 2008 far exceeded the amount reported as earnings by the Title Companies for that same year.  (2 Trial Tr. at 168).

100.    From the Abstract Account, Colson made two (2) payments totaling $56,051.37 to American Express in December 2008, as reflected in the following chart:

| American Express | |
|---|---|
| December 23, 2008 | $10,000.00 |
| December 24, 2008 | $46,051.37 |

(Pl. Ex. 61, Wachovia 003389).  In total, from May 2008 to January 2009, Colson paid $557,205.76 to American Express from the Abstract Account.  (2 Trial Tr. at 176).

**January 2009**

101.    The Wachovia Funding Account was overdrawn during the month of January 2009, on the following dates:  January 6, 7, 9, 13, 16, 20, 21, 22, 27, & 29.  (Pl. Ex. 118, Excerpt B).

102.    On many of the same dates that the Wachovia Funding Account was overdrawn during the month of January 2009, Colson transferred funds from the Wachovia Funding Account into the Abstract Account, the Life Premiums Account, and an account at Wachovia entitled "Expense Account."

103.    Despite the Wachovia Funding Account being overdrawn, Colson transferred $221,100.00 from the Wachovia Funding Account into the Abstract Account, as shown below:

| Abstract Account | |
|---|---|
| January 16, 2009 | $50,000.00 |
| January 20, 2009 | $92,000.00 |
| January 21, 2009 | $35,000.00 |
| January 29, 2009 | $44,100.00 |

(Pl. Ex. 61 at Wachovia 003368, 003369, 003369, & 003370; Pl. Ex. 130 at 5).

104.    Colson transferred $257,464.31 from the Wachovia Funding Account into the Life Premiums Account as shown in the following chart:

| Life Premiums Account | |
|---|---|
| January 7, 2009 | $ 35,987.64 |
| January 14, 2009 | $174,545.60 |
| January 20, 2009 | $ 12,647.92 |
| January 21, 2009 | $ 18,532.35 |
| January 28, 2009 | $ 15,750.80 |

(Pl. Ex. 95 at Wachovia 005045, 005050, 005052, 005053, & 005056).

105.    As the chart below demonstrates, Colson transferred $895.10 from the Wachovia Funding Account, while it was overdrawn, to the Expense Account:

| Expense Account | |
|---|---|
| January 9, 2009 | $542.30 |
| January 16, 2009 | $352.80 |

(Pl. Ex. 95 at Wachovia 005047, 005051).

106.    On January 26, 2009, Donna Treadaway ("Treadaway"), an employee of Prestige in the Tupelo Office, sent an email to Colson and Houston asking Houston to return $107,394.45 that she had withdrawn from the Tupelo Escrow Account.  (Pl. Ex. 115; 2 Trial Tr. 156-58).  The withdrawal had prevented Treadaway from conducting a closing.  Houston responded by reminding Treadaway that the Tupelo Escrow Account was ZBA because of the "sweep" feature of the master funding account.  Treadaway, in turn, reminded Houston that the Tupelo Escrow Account was held at Regions, not Wachovia, and was not part of the "sweep" between the Wachovia Funding Account and the individual office escrow accounts.  (Pl. Ex. 115; 2 Trial Tr. 156-58).

**February 2009**

107.    On February 4 and 6, 2009, the Wachovia Funding Account was again overdrawn.  (Pl. Ex. 118, Excerpt B).

108.    Colson transferred $90,046.05 from the Wachovia Funding Account to the Life Premiums Account, as follows:

| Life Premiums Account | |
|---|---|
| February 3, 2009 | $49,306.49 |
| February 5, 2009 | $40,739.56 |

(Pl. Ex. 95 at Wachovia 005023 & 005025).

109.    As a result of the Wachovia Funding Account being overdrawn on numerous days during January and February 2009, checks drawn on individual office escrow accounts in loan closings were dishonored by Wachovia.  (Pl. Ex. 118, Excerpt E).

110.    Throughout this time period, branch managers at the various locations of the Title Companies would email Colson and/or Houston to confirm the receipt of closing funds into the Wachovia Funding Account.  (2 Trial Tr. at 167).  Many times when Houston and/or Colson responded that the funds were not yet available, the funds had been posted in the Wachovia Funding Account, and sometimes had been available for disbursement for several days.  (*Id.*).

**Final QAR**

111.    On February 4, 2009, Fidelity, which had acquired Lawyers Title only one (1) month earlier, performed its final QAR (the "Final QAR") on the Title Companies.  (1 Trial Tr. at 59-60).

112.    Within a few days of the Final QAR, Patrick and his team of investigators were contacted to perform a forensic audit because "there were some accounting issues . . . [and the QAR representatives] were having trouble identifying whether there [were] sufficient funds in the account[s]."  (1 Trial Tr. at 58-62).

113.    Patrick and his team traveled to the Destin Office to "determine if there was an escrow account shortage, and calculate that shortage if there was [one]."  (1 Trial Tr. at 69).

114.    Houston readily made all of the Title Companies' files and documents available to Patrick and his team of investigators.  (1 Trial Tr. at 64).

115.    While at the Destin Office, Patrick and his team reviewed the Title Companies' bank accounts, as well as their SoftPro records.  (1 Trial Tr. at 63).

116.    Patrick and his team calculated the number of days that the escrow funds remained in an escrow account, known as the mortgage pay-off lag, in the Title Companies' accounts.   (1 Trial Tr. at 66).   Patrick and his team of investigators determined that the mortgage pay-off lag in February 2009 was between eleven (11) and 47 days.  (*Id.* at 67).  Patrick testified that typically "in a real estate closing, a mortgage pay off is wired out or paid by check the same day as the closing, and it typically clears the bank within one or two days."  (*Id.*).  If a mortgage pay-off lag is more than two (2) days, according to Patrick, then the delay could be covering up known shortages in the account.  (*Id.*).

117.    From the bank accounts and the SoftPro records, Patrick prepared a spreadsheet that calculated the minimum escrow shortages in the Title Companies' bank accounts for all real estate transactions.  Patrick made the calculations based on two (2) different scenarios.  (1 Trial Tr. at 68-69, 80; Pl. Ex. 125).  Under the first scenario, known as "Scenario A," Patrick included all funds, including viatical settlements funds, and in the second scenario, known as "Scenario B," he removed viatical settlements funds from the equation.  In Scenario A there was a shortage of $4,919,537.19 in the Title

Companies' accounts as of October 31, 2008 and a shortage of $7,997,670.64 as of January 31, 2009. (Pl. Ex. 125; 1 Trial Tr. at 69). In Scenario B, there was a shortage of $7,362,491.79 in the Title Companies' accounts as of October 31, 2008, and $9,543,924.73, as of January 31, 2009. (Pl. Ex. 125; 1 Trial Tr. at 69). Of the total estimated shortage of $9,543,924.73, Fidelity later determined that $4,904,627.37 was covered by the CPLs issued by Fidelity. (1 Trial Tr. at 92; Pl. Ex. 199).

118.    According to Patrick, the escrow shortages in the Title Companies' accounts were caused by "unsubstantiated transfers," which he described as transfers of escrow funds in even-dollar amounts that were not used to pay liens on collateralized real property or to pay fees for abstract or escrow services. Instead, these funds were transferred to other bank accounts held by the Title Companies and Colson's other companies. (1 Trial Tr. at 69).

119.    Houston called Colson and told him the Final QAR had uncovered problems in the accounts. Colson traveled to the Destin Office to meet with the representatives conducting the forensic audit from Fidelity. Colson then contacted John Ozbud ("Ozbud"), executive vice-president at Fidelity, and asked him for additional time to raise the necessary capital to cover the deficiencies in the Title Companies' accounts before Fidelity made its findings public. (4 Trial Tr. at 80; Pl. Ex. 118, Excerpt E). Colson was unable to reach an agreement with Ozbud and has not returned any of the missing funds.

120.    On February 6, 2009, Fidelity terminated the Prestige Agency Agreement and the Advanced Title Agency Agreement. (Pl. Ex. 118, Excerpt D).

121.    On February 10, 2009, Wachovia placed an "all restraint" hold on all of the accounts held by the Title Companies and Colson's other businesses after Fidelity notified Wachovia of its findings.[21]  The "all restraint" hold stopped all debits and credits from posting to these accounts.

_____

[21] The number and variety of accounts maintained by Colson at Wachovia reflects the complexity of his scheme.  These accounts were: (1) the account ending in "7233" entitled "Colson & Wells Premium Trust Account," (2) the account ending in "7246" entitled "Colson & Wells Premium Sweep Account," (3) the account ending in "7822" entitled "Expense Account," (4) the account ending in "4111" entitled "SJS," (5) the account ending in "4124" entitled "Hopkins Homes," (6) the account ending in "4263" entitled "Advanced Daphne Trust," (7) the account ending in "4292" entitled "PTI Jackson Trust," (8) the account ending in "4302" entitled "PTI Hattiesburg Trust," (9) the account ending in "4315" entitled "PTI Pensacola Trust," (10) the account ending in "4328" entitled "PTI Mobile Trust," (11) the account ending in "4331" entitled "PTI Southaven Trust," (12) the account ending in "4344" entitled "PTI Ocean Springs Trust," (13) the accounting ending in "4357" entitled "PTI Funding Account," (14) the account ending in "4399" entitled "Advanced Ocean Springs Trust," (15) the account ending in "4409" entitled "Advanced Destin Trust," (16) the account ending in "4412" entitled "Advanced Operating," (17) the accounting ending in "4496" entitled "TCG," (18) the account ending in "4509" entitled "Prestige Insurance Agency," (19) the account ending in "4519" entitled "PTI Agency Account," (20) the account ending in "4864" entitled "PTI Corporate Abstract," (21) the account ending in "4880" entitled "PTI Operating Account," (22) the account ending in "4893" entitled "PTI Fee Account," (23) the account ending in "4903" entitled "PTI Atlanta Trust," (24) the account ending in "4916" entitled "PTI Daphne Trust," (25) the account ending in "4932" entitled "PTI Destin Trust," (26) the account ending in "4945" entitled "PTI Gulfport Trust," (27) the account ending in "2033" entitled "Advanced Funding," (28) the account ending in "2059" entitled "Advanced Agency," (29) the account ending in "2062" entitled "Advanced Fee Account," (30) the account ending in "2499" entitled "Prestige Sports Mgmt," (31) the account ending in "2606" entitled "Adv Title OS Abstract," (32) the account ending in "2622" entitled Adv Title OS EMD Account," (33) the account ending in "7013" entitled "Houston AO 1 Checking," (34) the account ending in "7026" entitled "Houston AO 2 Checking," (35) the account ending in "7039" entitled "Houston AO 2 Money Market," (36) the account ending in "7055" entitled "Houston AO 1 Money Market," (37) the account ending in "7110" entitled "Colson and Waller," (38) the account ending in "7220" entitled "Colson and Wells," (39) the account ending in "7550" entitled "Advanced Pensacola Trust," (40)  the account ending in "7563" entitled "Advanced Pensacola EMD," (41) the account ending in "7615" entitled "PTI Daphne Recording Acct," (42) the account ending in "7628" entitled "PTI Niceville Trust," (43) the account ending in "7796" entitled "Adv Panama City EMD," (44) the account ending in "7806" entitled "Adv Panama City Trust," (45) the account ending in "7819" entitled "Adv Destin EMD," (46) the account ending in "7822" entitled "Title 1 Biloxi EMD," (47) the

122.    In an effort to continue operating his other businesses, on February 11, 2009, Colson opened new accounts at Regions.  (4 Trial Tr. at 177; Pl. Ex. 118, Excerpt D).

123.    By February 13, 2009, representatives from Fidelity were at many of the Title Companies' branch offices collecting files, seizing computers, and closing the offices.  (4 Trial Tr. at 82).

124.    On or about February 15, 2009, Colson transferred $75,000.00 by wire from the Prestige Sports' account to Swanzy's personal bank account.  (Swanzy Dep. at 40-41).   Swanzy could not explain the reason for the payment and returned the wire the same day.

125.    To aid Fidelity in processing claims under the CPLs, Fidelity obtained a forensic copy of the Title Companies' computer server containing SoftPro records.  (1 Trial Tr. at 71).  Patrick testified that there were roughly 3,900 blank HUD-1s in the forensic copy of the SoftPro records as of the start of the Trial.  (*Id.* at 77-79, 89-90). The same SoftPro records, however, appeared to be intact when Patrick reviewed them at the Destin Office during his forensic audit in February 2009.

126.    On March 10, 2009, A&O ended its escrow management services agreement with Colson.  (Pl. Ex. 118, Excerpt D).

127.    On October 5, 2009, The Mississippi Bar filed a Formal Complaint against Colson "alleging violations of the Rules of Professional Conduct."  This disciplinary matter has been held in abeyance pending the resolution of the Adversary and other

account ending in "7835" entitled "Title 1 Biloxi EMD," (48) the account ending in "7848" entitled "PTI Niceville EMD." (Pl. Ex.118, Excerpt D).

litigation pending against Colson.   Until then, Colson has been suspended from the practice of law in Mississippi.

**Bankruptcy Case**

128.   On September 4, 2009, due to mounting litigation against him and his Title Companies, Colson filed a voluntary petition (the "Petition") for relief under chapter 7 of the Code (the "Bankruptcy Case") in the United States Bankruptcy Court of the Southern District of Mississippi (the "Bankruptcy Court"). (Dkt. 1).

**Interpleader Actions**

129.   On February 13, 2009, Wachovia filed an interpleader action against Colson in the Chancery Court of Harrison County, Mississippi, Second Judicial District (the "Chancery Court"), in Case No. C-2402-09-111(4) (the "Wachovia Interpleader Action"), in which Wachovia alleged that it had discovered "unusual transfers and movements between [Colson's] accounts which apparently were made in such a way as to cover potential overdrafts" and that funds held in these accounts were subject to multiple claims that could not be determined by Wachovia.   Wachovia tendered $1,534,563.56, the balances in all of the accounts, into the registry of the Chancery Court. On August 7, 2009, Regions filed a similar interpleader action in the same Chancery Court in Case No. C-2402-09-631(1) (the "Regions Interpleader Action") and tendered $300,500.78 into the Chancery Court registry.  (No. 10-05002-NPO, Adv. Dkts. 1 & 66). Together, the Wachovia Interpleader Action and the Regions Interpleader Action are sometimes referred to as the "Interpleader Actions."

130.   After Colson filed the Petition, the Interpleader Actions were removed to the United States District Court of the Southern District of Mississippi.  (No. 10-05002-

NPO, Adv. Dkt. 2-2; No. 10-05032-NPO, Adv. Dkt. 1). Both Interpleader Actions were then referred to the Bankruptcy Court, although at different times. The Regions Interpleader Action was referred to the Bankruptcy Court on December 4, 2009, and was assigned adversary proceeding number 10-05002-NPO. (No. 10-05002-NPO, Adv. Dkt. 1). The Wachovia Interpleader Action was referred to the Bankruptcy Court on May 7, 2010, and was assigned adversary proceeding number 10-05032-NPO. (No. 10-05032-NPO, Adv. Dkt. 1).

131. On May 26, 2010, the Chancery Court deposited $300,918.02 (representing the original deposit by Regions of $300,500.78 plus accrued interest) into the registry of the Bankruptcy Court. (No. 10-05002-NPO, Adv. Dkt. 66). Later, on February 17, 2012, the Chancery Court deposited $1,541,676.26, plus accrued interest, into the registry of the Bankruptcy Court (No. 10-05032-NPO, Adv. Dkt. 145).

132. The chapter 7 trustee assigned to the Bankruptcy Case, Kimberly R. Lentz (the "Trustee"), intervened in both Interpleader Actions and filed cross-claims against Colson, the Titles Companies, and others who she believed might have an interest in the interpled funds. (No. 10-05002-NPO, Adv. Dkt. 130; No. 10-05032-NPO, Adv. Dkt. 1-28). In the cross-claims, the Trustee asserted that unless a party could trace its ownership to the interpled funds, Colson's bankruptcy estate was entitled to the funds based upon the theory of reverse-piercing the corporate veils of Prestige and Advanced Title.

133. In the Regions Interpleader Action, the Trustee settled with all parties who had entered an appearance. As a result of this settlement, $72,541.36 was disbursed to Resanant Bank on or about September 28, 2010 (No. 10-05002-NPO, Adv. Dkt. 124),

and $33,818.00 was disbursed to CMH Homes, Inc. on May 26, 2011 (No. 10-05002-NPO, Adv. Dkt. 195).

134.     In the Interpleader Actions, the Trustee obtained default judgments against Colson, as well as several of his businesses, who had failed to respond to the Trustee's cross-claims.  (No. 10-05002-NPO, Adv. Dkt. 230; No. 10-05032-NPO, Adv. Dkt. 149). By default, the Court entered an order reverse-piercing the corporate veils of Prestige and Advanced Title and finding that the interpled funds constituted property of Colson's bankruptcy estate.  (No. 10-5002-NPO, Adv. Dkt. 230; 10-05032-NPO, Adv. Dkt. 149).

135.     Consistent with the Court's finding that the remaining interpled funds constituted property of Colson's bankruptcy estate, the Bankruptcy Court disbursed $1,542,086.20 to the Trustee in the Wachovia Interpleader Action (No. 10-05032-NPO, Adv. Dkt. 161) and $194,758.04 in the Regions Interpleader Action  (No. 10-05002-NPO, Adv. Dkt. 231).

136.     Therefore, as a result of the Interpleader Actions, the Bankruptcy Court disbursed $1,736,844.24, plus interest, to the Trustee.

**Adversary**

137.     On March 11, 2010, Fidelity filed the Complaint (Adv. Dkt. 2) against Colson.

138.     In the Complaint, Fidelity asserted claims against Colson for (1) breach of fiduciary duty, (2) breach of contract, (3) breach of the duty of good faith and fair dealing, (4) embezzlement, (5) fraud, (6) negligence, (7) conversion, (8) unjust enrichment, (9) bad faith, and (10) indemnity.  Fidelity alleges that its claims against

Colson are nondischargeable in the Bankruptcy Case under §§ 523(a)(2)(A), (a)(2)(B), (a)(4), and (a)(6).

139.   On July 15, 2010, Colson filed the Answer in the Adversary.

140.   On March 4, 2011, the Court entered an order allowing Fidelity to change its name on the docket from Lawyers Title to Fidelity, as successor-in-interest to Lawyers Title (Adv. Dkt. 46).

141.   On February 2, 2012, Fidelity filed a Motion for Partial Summary Judgment on Liability and Non-Dischargeability of Stephen R. Colson (the "Motion for Partial Summary Judgment") (Adv. Dkt. 73).   In the Motion for Partial Summary Judgment, Fidelity asked the Court to find as a matter of law that Colson incurred a debt of over $6.5 million to Fidelity through defalcation while acting in a fiduciary capacity and that the debt is nondischargeable under § 523(a)(4).   (*Id.*).

142.   On May 30, 2012, the Court issued its Memorandum Opinion and Order Granting in Part and Denying in Part Motion for Partial Summary Judgment on Liability and Non-Dischargeability of Debt of Stephen R. Colson (the "Summary Judgment Opinion") (Adv. Dkt. 84).   In the Summary Judgment Opinion, the Court granted partial summary judgment to Fidelity and entered a declaratory judgment that held that "[t]he requirements for *res judicata* have been met here, and . . . the Title Companies were simply alter egos of the Debtor [Colson].   (*Id.* at 18).   The Court denied the Motion for Partial Summary Judgment "in part because the Court cannot determine as a matter of law whether [Colson] committed defalcation while acting as a fiduciary."   (*Id.* at 23-24).

**Trial**

      **Liability**

143.    A Trial was held in the Adversary from January 14-16, January 28-29, and August 20, 2013.

      **Damages**

144.    At Trial, Perry testified that Fidelity paid forty-five (45) claims under CPLs as a result of Colson's failure to disburse trust funds received from lenders as required.  (1 Trial Tr. at 169).  In total, Perry testified that Fidelity incurred $4,904,627.37 in damages as a result of its payments of the above-mentioned claims.  (1 Trial Tr. at 170; Pl. Ex. 199).

145.    Fidelity submitted as an exhibit at Trial a chart summarizing the forty-five (45) claims. The chart listed:  (1) the closing date, (2) the agent and location, (3) the title commitment and closing protection letter policy date, and (4) the assignment of the claim to Fidelity.  (Pl. Ex. 199).  In forty-one (41) of the closings, each of the lienholders of record for the real estate subject to the closing submitted a settlement or payoff statement to the Title Companies showing how much each was required to be paid as a condition for releasing its lien.  (Pl. Exs. 154-70, 172-79, 181-84, 186-96, & 198).  The Title Companies closed these sales transactions and released the liens without paying the lienholders.  When checks were presented for payment at Wachovia or Regions, they were dishonored for insufficient funds.

146.    Fidelity introduced as exhibits at Trial the entire claims files for five (5) of these claims, as examples of the losses they incurred.  (Pl. Exs. 157-82).  These five (5) claims are summarized as follows:

a.      Prestige's Jackson Office closed a loan on January 15, 2009, in which Frances Lynn Boyd and Phillip Boyd refinanced an existing loan on certain real property located in Madison, Mississippi. (Pl. Ex. 161). The new lender, Fifth Third Bank, received a CPL issued by Fidelity dated December 18, 2008. Fifth Third Bank wired $192,500.30 on January 21, 2009, to the Prestige Funding Account. Prestige issued a check drawn on the same account in the amount of $188,220.23 to Taylor Bean & Whitaker Mortgage Corporation, the original lender, on January 21, 2009. Wachovia did not honor the check. Lawyers Title paid Fifth Third Bank $191,067.97 in satisfaction of its claim under the CPL. Fifth Third Bank assigned its claim to Lawyers Title and Fidelity on November 10, 2009.

b.      Prestige's Hattiesburg Office closed a loan refinancing on January 28, 2009, in which Jason Nagel ("Nagel") refinanced an existing loan on certain real property located in Petal, Mississippi. (Pl. Ex. 182). The new lender, Countrywide Bank, FSB ("Countrywide"), received a CPL issued by Fidelity dated January 26, 2009. The loan was funded on January 28, 2009. Nagel rescinded the loan on January 29, 2009. Prestige did not return the funds to Countrywide. Fidelity paid $174,849.95 to Countrywide in satisfaction of its claim under the CPL.

c.      Advanced Title's Pace Office closed a refinancing loan on January 29, 2009, in which Eric Buckner and Melanie Buckner refinanced an existing loan on certain real property located in Milton, Florida. (Pl. Ex. 165). Prestige issued the new lender, Whitney National Bank ("Whitney"), a CPL dated January 9, 2009, on behalf of Lawyers Title. Whitney funded the loan on February 3, 2009. Prestige issued a check in the amount of $292,789.92 to JPMorgan Chase, the original lender, on February 3, 2009. Wachovia returned the check to JPMorgan Chase for "stop payment." Fidelity paid Whitney $296,420.11 in satisfaction of its claim. Fidelity also paid $300.00 to Eric Buckner and Melanie Buckner. Whitney assigned its claim to Fidelity on July 24, 2009.

d.      Prestige's Hattiesburg Office closed a loan refinancing on January 30, 2009, in which James Houston Drury and Latisha Eileen Drury refinanced an existing loan with Citizens Bank on real property located in Petal, Mississippi. (Pl. Ex. 158). Prestige issued JPMorgan Chase a CPL dated January 9, 2009, on behalf of Lawyers Title. JPMorgan Chase funded the loan on January 30, 2009. Prestige issued a check, dated January 30, 2009, in the amount of $170,571.32 to Citizens Bank in satisfaction of the original loan. Citizens Bank presented the check for payment on February 11, 2009, and Wachovia returned the check to Citizens Bank for "stop payment." Fidelity paid

JPMorgan Chase $179,487.86 in satisfaction of its claim. JPMorgan Chase assigned its claim to Lawyers Title and Fidelity on December 9, 2009. (2 Trial Tr. at 147-48).

e.      Prestige's Jackson Office closed a loan on February 9, 2009, in which John A. Lewis, Jr. and Allison T. Lewis purchased property located in Flowood, Mississippi. (Pl. Ex. 157). Prestige issued the lender, Countrywide, a CPL on behalf of Fidelity dated January 13, 2009. Countrywide wired the funds to the Wachovia Funding Account on February 9, 2009. On that same date, Prestige disbursed $509,002.48 to Priority One Bank and $53,366.40 to Lewis Holdings, Inc. Wachovia returned both checks as unpaid on February 12, 2009. Fidelity paid $577,803.96 in satisfaction of the claim under the CPL to Countrywide. Countrywide assigned its claim to Fidelity on November 9, 2009.

147.    In the remaining four (4) claims, monies deposited into the escrow accounts of the Title Companies in Florida could not be accounted for, and Fidelity, as their principal, was required under Florida statutory law to pay the claims. (Pl. Exs. 171, 180, 185, & 197).

148.    Fidelity seeks to recover monies it paid on the above-mentioned claims under the CPLs issued pursuant to the Prestige Agency Agreement, the Advanced Title Agreement, its "subrogation rights with the lenders . . . [, and by] direct assignment from those lenders." (1 Trial Tr. at 171).

149.    In addition, Fidelity introduced a spreadsheet detailing its attorneys' fees and costs into evidence. (Pl. Ex. 204). The spreadsheet shows that Fidelity has incurred $1,413,698.60 in attorneys' fees and expenses in connection with its processing of claims under the CPLs and the litigation of the Adversary. (*Id.*). This amount does not include attorneys' fees and expenses incurred in preparation of, or during, the Trial. (2 Trial Tr. at 127; *see also* Pre-trial Order).

150.    According to Fidelity, Colson's debt to Fidelity is nondischargeable under §§ 523(a)(2)(A), 523(a)(2)(B), 523(a)(4), and 523(a)(6).

## DISCUSSION

In the Adversary, Fidelity asks the Court to liquidate its state-law claims against Colson and declare those claims excepted from Colson's bankruptcy discharge under § 523(a). The Court begins by determining whether Colson owes a debt to Fidelity under any of the state-law grounds alleged by Fidelity in the Complaint. *See Lanier v. Futch* (*In re Futch*), Adv. No. 09-00144-NPO, 2011 WL 576071, at *12 (Bankr. S.D. Miss. Feb. 4, 2011) (before a debt can be declared nondischargeable, there must first be an underlying debt); *see also In re Morrison*, 555 F.3d 473, 478-79 (5th Cir. 2009) (upholding bankruptcy court's authority to liquidate state-law claim when determining dischargeability of that claim). Assuming there is a debt, the Court then will determine whether that debt was discharged in Colson's bankruptcy case.

## I.    State-law Claims

### A.    Choice of Law

Before considering the merits of any of Fidelity's state-law claims, the Court must determine whether a choice-of-law issue arises in the Adversary given that the Title Companies had branch offices in four different states, Mississippi, Alabama, Florida, and Louisiana, in 2008 and 2009 when the alleged wrong doing took place. In that regard, Colson frames his arguments in the briefs under Mississippi law without addressing whether the substantive law of any other state applies to some or all of the issues in the Adversary. Fidelity does not discuss the choice-of-law issue outright but cites the

substantive law of Florida, Alabama, and Louisiana, as well as Mississippi for the same legal principle.

Of the forty-five (45) closings in which escrow funds were missing, twenty-six (26) of them involved real property located in Mississippi where Colson resides and where the Title Companies maintained their principal places of business. Seventeen (17) of the closings involved real property located in Florida, and the remaining two closings involved real property located in Alabama and Louisiana. Colson's alleged misappropriation of escrow funds occurred in Mississippi. The Wachovia Funding Account, which served as the initial repository for all escrow funds, was maintained in Mississippi. The alleged misrepresentations by Colson occurred when he completed the agency applications in the main office in Mississippi. Fidelity is a Virginia company, and the lenders that sustained losses as a result of the closings reside in Mississippi as well as numerous other states. These facts suggest that states other than Mississippi may have an interest in the outcome of the Adversary.

A choice-of-law analysis, however, is necessary only when there is a material difference in the substantive laws of two (2) or more states. *Chapman v. Thrasher Trucking Co.*, 729 F. Supp. 510, 510 (S.D. Miss. 1990) (choice-of-law analysis is necessary only when there is a conflict "hav[ing] a significant effect on the outcome of the case"); *Zurich Am. Ins. Co. v. Goodwin*, 920 So. 2d 427, 432 (Miss. 2006). Because the parties have not asserted or shown that such a conflict exists, the Court applies the substantive law of the forum state, Mississippi.

The Court would reach this same result even if it the parties had shown that there were conflicts in the laws. In its choice-of-law analysis, Mississippi applies the most

significant relationship test as embodied in the RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145. *See McDaniel v. Ritter*, 556 So. 2d 303, 310 (Miss. 1990). Specifically, § 145 applies the law of the state which, with respect to an issue in tort, has the most significant relationship to the occurrence and the parties under the principles stated in § 6. RESTATEMENT (SECOND) OF CONFLICT OF LAWS §145. Section 145 lists several factors relevant in applying the principles of § 6:

(a) the place where the injury occurred,
(b) the place where the conduct causing the injury occurred,
(c) the domicile, residence, nationality, place of incorporation, and place of business of the parties, and
(d) the place where the relationship, if any, between the parties is centered.

RESTATEMENT (SECOND) CONFLICT OF LAWS § 145. Section 6, in turn, provides the factors relevant to the choice-of-law analysis:

(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant polices of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability, and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6. "The factors enumerated in section 6 will from case to case be given such relative weight as they are entitled, consistent with the general scheme of the center of gravity test." *Boardman v. United Servs. Auto. Ass'n,* 470 So. 2d 1024, 1032 (Miss. 1985).

A summary of the facts here shows that Mississippi has the most significant contacts to the occurrence and the parties. Colson resides in Mississippi and formed Prestige and Advanced Title under Mississippi law. He maintained the principal places of business of Prestige and Advanced Title in Mississippi. Although insurance premiums

were paid to Lawyers Title and Fidelity on properties insured in Mississippi, Louisiana, Alabama, and Florida, the funds were paid from the Wachovia Funding Account located in Mississippi.  *See Houston Cas. Co. v. Certain Underwriters at Lloyd's London,* 51 F. Supp. 2d 789, 797 (S.D. Tex. 1999) (holding that insured's obligation under the parties' agreement was to pay a premium and the insurer's obligation was to indemnify certain losses but w*here* the losses occurred did not affect either obligation.).  Here, the lenders sustained losses in different states; however, the conduct resulting in the losses occurred in Mississippi.  Therefore, the Court concludes, in the alternative, that Mississippi substantive law applies to the dispute between the parties based upon of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 and § 145.  The Court now turns to the merits of Fidelity's state-law claim against Colson based upon an alleged breach of his fiduciary duty to the lenders.

### B.      Breach of Fiduciary Duty

The Court finds that under Mississippi law Colson breached his fiduciary duty to the lenders by commingling trust funds with personal funds and using those commingled trust funds for a purpose other than for what they were intended.  The classic definition of a trust is a fiduciary relationship in which one person, the trustee, holds the legal title to property subject to a fiduciary duty to deal with or use the property for the benefit of another, the beneficiary.  RESTATEMENT (THIRD) OF TRUSTS § 2.  "The touchstone of the fiduciary relationship between the trustee and his beneficiaries is loyalty."  JEFFREY JACKSON & MARY MILLER, ENCYCLOPEDIA OF MISSISSIPPI LAW § 73:8.  The four (4) requirements of an express trust are:  (1) an intent to create a trust, (2) a trustee, (3) a trust

*res* or trust property, and (4) a definite beneficiary.  *Davis v. Aetna Acceptance Corp.*, 293 U.S. 328, 333 (1934).

The Court finds that the funds Colson held in the escrow accounts were maintained in an express trust.  The lenders deposited funds in the escrow accounts in connection with real estate transactions and provided Colson written instructions prior to each closing.  Colson's failure to disburse the escrow funds pursuant to the lenders' closing instructions and his use of escrow funds for his own personal benefit constituted a breach of Colson's fiduciary duty to those lenders.

> Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties.  A trustee is held to something stricter than the morals of the market place.  Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior . . . .  Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty. . . . Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd.

*Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928) (Cardozo, J.).  Colson's own testimony supports the Court's finding that he breached his fiduciary duty to the lenders.  "I did not know what the balances were in my funding account, nor did I have them "three-way" reconciled. . . . I don't know what happened to our funding account over time."  (4 Trial Tr. at 204-05); *see* MISS. CODE ANN. § 91-9-107(2) ("[A] trustee has a duty to act with due regard to his obligation as a fiduciary.").  Indeed, in the Pre-trial Order, Colson stipulated that trust funds were missing from the escrow accounts.  (Pre-trial Order at 15).

Notwithstanding these admissions, Colson maintains that Fidelity cannot prove that he violated a fiduciary duty because Fidelity cannot prove that he breached the terms of the Prestige Agency Agreement.  *See Nicolas v. Deposit Guar. Nat'l Bank*, 182 F.R.D.

226, 234 (N.D. Miss. 1998), *citing Carter Equip. Co. v. John Deere Indus. Equip. Co.*, 681 F.2d 386 (5th Cir. 1982) (holding that in the absence of terms in a contract that violate public policy, conduct in conformance with those terms cannot amount to the breach of a fiduciary duty).  As evidence that he did not breach the Prestige Agency Agreement, Colson points out that Lawyers Title never attempted to terminate the Prestige Agency Agreement even though Lawyers Title knew, because of the QARs, that the escrow accounts were subject to the "sweep" feature of the Wachovia Funding Account, some of the escrow accounts were not being "three-way" reconciled, and some of the escrow accounts carried negative balances.

The Court finds Colson's argument regarding the QARs misplaced, for the simple reason that Fidelity asserts the rights of the lenders as their subrogee.  Therefore, the only defenses available against Fidelity as the subrogee are those that Colson could assert against the lenders.  *Orme*, 422 F. Supp. 2d at 687; *Twin States Ins. Co. v. Bush*, 183 So. 2d 891, 893 (Miss. 1966).  Because Colson cannot assert the QARs as a defense against the lenders, who played no part in the review process and who were not parties to the Prestige Agency Agreement, he cannot assert it against Fidelity, as their subrogee.[22]

For the above reasons and for the reasons set forth later in this Opinion regarding Fidelity's claim under § 523(a)(4) where the structure of the escrow accounts and the disbursements from those accounts are discussed in greater detail, the Court finds that Colson owed a fiduciary duty to the lenders and that he breached that duty under Mississippi law, resulting in losses to Fidelity in the amount of $4,904,627.37.  (Pl. Ex.

---

[22] Even if Colson could assert a defense based upon the QARs against the lenders, it would lack merit in the absence of evidence that Lawyers Title expressly authorized Colson to self-deal in the escrow funds.

199).  Having reached this finding of liability, it is unnecessary for the Court to consider the remaining state-law claims asserted by Fidelity against Colson.

## II.      Dischargeability of Claim

Having determined that Colson owes a debt to Fidelity, the Court next considers the dischargeability issue, which was the focus of most of the testimony and evidence at Trial.  A debtor in a chapter 7 bankruptcy case is generally granted a discharge of all of his debts that arose before he filed his petition for relief, except for certain debts listed in § 523(a).[23]  *Hosack v. IRS (In re Hosack)*, 282 Fed. App'x 309, 313 (5th Cir. 2008) (unpublished).  These exceptions to discharge are narrowly construed in favor of the debtor because the discharge is what provides the "honest but unfortunate debtor" with a "fresh start."  *Grogan v. Garner*, 498 U.S. 279, 286 (1991); *Fezler ex rel. Fezler v. Davis (In re Davis)*, 194 F.3d 570, 573 (5th Cir. 1999) (citing *Lines v. Frederick*, 400 U.S. 18, 19 (1970)).  The party objecting to the discharge must prove the debt is nondischargeable by a preponderance of the evidence.  *Grogan*, 498 U.S. at 285-87.

Fidelity alleges that Colson's debt is nondischargeable under § 523(a)(4) because the debt arose as the result of a "defalcation while acting in a fiduciary capacity."[24]  Fidelity contends that Colson's debt is nondischargeable under § 523(a)(4) because "while acting in his fiduciary capacity, [Colson] failed to keep real estate transaction

---

[23] Section 523 excepts from discharge nine (9) distinct categories of debt.  11 U.S.C. § 523(a); *Boyle v. Abilene Lumbers, Inc.* (*In re Boyle),* 819 F.2d 583, 587 n.6 (5th Cir. 1987).

[24] Because the Court finds that the debt is excepted from discharge as a debt arising from a defalcation in a fiduciary capacity pursuant to § 523(a)(4), the issues and argument presented by Fidelity with respect to the alleged nondischargeability of this debt because of a false representation under § 523(a)(2) or  a willful and malicious injury under § 523(a)(6) need not be reached.

funds separated, permitted those funds to be "swept" into funding accounts each night where they were then hopelessly comingled with other funds[, and then] transfer[red] the funds to accounts for his other unrelated business activities." [25]  (Fidelity Pre-trial Br. at 9).   In short, Fidelity accuses Colson of converting and/or embezzling funds that belonged to lenders.  (Pre-trial Order at 4).

### A.    Fiduciary Capacity

As mentioned previously, Fidelity asserts its claim against Colson by virtue of subrogation and/or assignment.   As the subrogee, Fidelity steps into the shoes of the lenders, the subrogors, and assumes the rights and defenses of the lenders.  *Shavers v. JPMorgan Chase Bank, N.A.*, 418 B.R. 589, 605 (Bankr. S.D. Miss. 2009).   In other words, Fidelity asserts the rights of the lenders to have their claims declared nondischargeable under § 523(a)(4).  For this reason, the Court examines the existence of a fiduciary duty from the perspective of Fidelity, as the subrogee of the lenders.

The existence of a fiduciary relationship is a question of federal law.  *FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 620 (5th Cir. 2011).  In defining "fiduciary capacity" in § 523(a)(4), the traditional definition under state law is too broad.  *Davis v. Aetna Acceptance Co.*, 293 U.S. 328 (1934).   Rather, a fiduciary for purposes of § 523(a)(4) requires the existence of an express trust and, unlike state law, does not include a resulting or constructive trust that courts sometimes impose as an equitable remedy.  *In re Angelle*, 610 F.2d 1335, 1341 (5th Cir. 1980).  Thus, the duties of a fiduciary as defined in § 523(a)(4) must arise independent of, and must have been imposed prior to (rather than by virtue of), any alleged wrongful act by the fiduciary.

---

[25] Fidelity does not allege that Colson failed to remit title insurance premiums collected on Fidelity's behalf.

*Shcolnik v. Rapid Settlements, Ltd. (In re Shcolnik)*, 670 F.3d 624, 627 (5th Cir. 2012). In short, this narrower definition of a "fiduciary" under § 523(a)(4) includes only express trusts that existed before the alleged wrongdoing took place.

Applying this definition, the Court finds that Colson was a fiduciary of the lenders, such that Colson held the loan proceeds in trust for their benefit. This finding is supported by the same nucleus of operative facts that formed the basis of the Court's prior determination that Colson had a fiduciary duty to the lenders under Mississippi law. As noted in that discussion, Colson was required to segregate funds from the lenders into escrow accounts and disburse those funds only for the purposes for which they were entrusted to him. The funds were property of the lenders, and Colson had no claim to the funds prior to their disbursement at the loan closing. Then, at the closing, Colson's claim was limited to the fee he was entitled to receive for the escrow services provided by Prestige and Advanced Title. The CPLs and the trust accounts maintained by Colson for the funds created an express trust between Colson and the lenders. Also, the Prestige Agency Agreement and the Advanced Title Agency Agreement contained the attributes of an express trust by requiring Prestige to "[k]eep all funds . . . in an account separate from [Prestige's] individual accounts and designated as an 'escrow' . . . account, and disburse such funds only for the purposes for which the same were entrusted." *See Pac. Nw. Title Ins. Co. v. Owens (In re Owens)*, No. 09-50689, 2010 WL 4116472, at *5 (Bankr. S.D. Ind. Oct. 15, 2010) (noting that title agency agreement contained attributes of an express trust in favor of lenders). That Colson was a fiduciary of the lenders is supported by decisions of other courts that have found escrow agents to be serving in a fiduciary capacity. *See, e.g., Commonwealth Land Title Co v. Blaszak (In re Blaszak)*,

397 F.3d 386, 391 (6th Cir. 2005) (holding that for nondischargeability purposes, a fiduciary relationship existed between creditor and debtor, who signed an agency agreement appointing and authorizing debtor's title insurance business to be an issuing agent for creditor). Having found that Colson was a fiduciary of the lender, the Court now turns to whether the debt arose from a defalcation while acting in a fiduciary capacity.

### B.    Defalcation

The Court has previously found that Colson breached his fiduciary duty to the lenders under Mississippi law. Not every debt that arises from a breach of a fiduciary duty, however, is a defalcation under § 523(a)(4). Until recently, there was a split of authority among the federal circuit courts as to the particular mental state required for a finding of defalcation. A brief summary of the divergent views of the federal circuit courts is helpful in understanding the definition adopted by the Supreme Court in *Bullock* and how it differs from the definition previously espoused by the Fifth Circuit.

Before *Bullock*, the Fifth Circuit had previously held that "defalcation is a willful neglect of duty, even if not accompanied by fraud, or embezzlement." *Moreno v. Ashworth (In re Moreno)*, 892 F.2d 417, 421 (5th Cir. 1990). Later, the Fifth Circuit explained that "willful neglect of duty" was "essentially a recklessness standard." *Schwager v. Fallas (In re Schwager)*, 121 F.3d 177, 185 (5th Cir. 1997) (citing *Cent. Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510, 511 (2d Cir. 1937) (L. Hand, J.). The objective-recklessness standard posited by the Fifth Circuit was embraced by the Sixth and Seventh Circuits. *See Patel v. Shamrock Floorcovering Serv., Inc. (In re Patel)*, 565

F.3d 963, 970-71 (6th Cir. 2009); *Follett Higher Educ. Group, Inc. v. Berman (In re Berman)*, 629 F.3d 761, 765 n.3 (7th Cir. 2011).

Other circuit courts adopted a definition of defalcation that required proof that the fiduciary acted either with extreme recklessness or simple negligence. The First and Second Circuits required "a showing of conscious misbehavior or extreme recklessness— a showing akin to the showing required for scienter in the securities law context." *Denton v. Hyman (In re Hyman)*, 502 F.3d 61, 68 (2d Cir. 2007); *Rutanen v. Baylis (In re Baylis)*, 313 F.3d 9, 20 (1st Cir. 2002). The Fourth, Eighth, and Ninth Circuits, on the other hand, used a standard for defalcation that did not require any specific intent but, rather, required only proof of a loss of trust funds. *Republic of Rwanda v. Uwimana (In re Uwimana)*, 274 F.3d 806, 811 (4th Cir. 2001); *Tudor Oaks Ltd. P'ship v. Cochrane (In re Cochrane)*, 124 F.3d 978, 984 (8th Cir. 1997); *Blyler v. Hemmeter (In re Hemmeter)*, 242 F.3d 1186, 1191 (9th Cir. 2001).

As mentioned previously, the Supreme Court granted certiorari in *Bullock* to resolve the split of authority among the federal circuit courts. In *Bullock*, Randy Curtis Bullock ("Randy Bullock") served as the trustee of his father's living trust. *See BankChampaign v. Bullock (In re Bullock)*, No. 10-80003, 2010 WL 2202826 (Bankr. N.D. Ala. May 27, 2010). Randy Bullock and his four siblings were the beneficiaries of the trust. Randy Bullock used the trust funds to make loans to himself and his mother. Although the loans were fully repaid, Randy Bullock's brothers, after learning of the existence of the trust, filed suit against him in state court. The state court found that Randy Bullock did not appear to have a "malicious motive" in borrowing the trust funds but ruled that he had breached his fiduciary duty because the loans were self-dealing

transactions.  The state court ordered Randy Bullock to disgorge the profits that he made from the loans.

Randy Bullock commenced a bankruptcy case in hopes of discharging the state court judgment.  BankChampaign, which had replaced Randy Bullock as the trustee of his father's living trust, initiated an adversary proceeding to oppose the dischargeability of the judgment debt pursuant to § 523(a)(4).  The bankruptcy court ruled in favor of BankChampaign on the ground the state court judgment supported a finding of a defalcation while acting in a fiduciary capacity.  The bankruptcy court applied a standard in which a defalcation resulted from a "fiduciary's failure to account for fraud due to any breach of duty whether it was intentional, willful, reckless or negligent."  *Bullock*, 2010 WL 2202826, at *5 (citation omitted).

On appeal, the district court and the Eleventh Circuit affirmed the bankruptcy court's decision.  *Bullock v. BankChampaign (In re Bullock)*, No. 5:10-cv-01905 (N.D. Ala. Mar. 22, 2011), *aff'd*, 670 F.3d 1160 (11th Cir. 2013).  The Eleventh Circuit, however, disagreed with the culpability standard applied by the lower courts and held that a nondischargeable defalcation required more than mere negligence but "a known breach of a fiduciary duty," akin to the objective-recklessness definition embraced by the Fifth Circuit.  *Bullock v. BankChampaign (In re Bullock),* 670 F.3d 1160, 1166 (11th Cir. 2013).  Applying the objective-recklessness standard to the facts, the Eleventh Circuit concluded that the state court judgment supported a finding that Randy Bullock had committed a defalcation and, thus, affirmed the district court's decision.

The Supreme Court thereafter ruled in a unanimous decision that the term "defalcation" as used in § 523(a)(4) "includes a culpable state of mind requirement,"

which involves the "knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Bullock,* 133 S. Ct. at 1757.  Of relevance to the Adversary, the decision in *Bullock* abrogated the Fifth Circuit cases holding that objective-recklessness could constitute a defalcation.

The Supreme Court explained that "where the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong." *Id.* at 1759.  The Supreme Court included as "intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent." *Id.*  This includes reckless conduct of the kind set forth in the Model Penal Code § 2.02(2)(c),[26] which the Supreme Court favorably compared to the "severe recklessness" standard used in securities fraud cases.  *Id. (citing Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976)).  Thus, there may be a defalcation "if the fiduciary 'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty." *Bullock,* 133 S. Ct. at 1759.  That "risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves *a gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation." *Id.* at 1760 (citation omitted).

---

[26] Model Penal Code § 2.02(2)(c) provides:

A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct.  The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.

Model Penal Code § 2.02(2)(c).

Colson contends that Fidelity did not prove the level of intent necessary for a finding of defalcation under the heightened degree of fault announced in *Bullock*. Specifically, Colson maintains that Fidelity failed to show that the missing funds were escrow funds rather than funds that belonged to him by virtue of his ownership of the Title Companies or funds that belonged to entities other than the lenders. In the alternative, Colson maintains that Fidelity cannot show that his inability to account for the missing funds, assuming they were trust funds, was the result of malfeasance, rather than inadvertence or mere negligence.

Fidelity, on the other hand, argues that Colson engaged in defalcation in two ways. First, Colson allowed escrow funds to be deposited and/or "swept" into a master funding account that resulted in the escrow funds being commingled with other funds used in operating his businesses. Second, Colson used commingled funds either for his own personal benefit or for the benefit of his other businesses.

Two financial experts, Ingram and Culumber, and one legal expert, Shows, testified at Trial regarding the flow of money through the various accounts, and the standard of care owed by Colson to the lenders as their fiduciary. Their testimony was crucial to the Court in sifting through the claims and defenses of the parties and is briefly reviewed here.

### 1.    Ingram

As previously mentioned, Fidelity called Ingram as an expert witness in the field of forensic accounting. Ingram is a certified public accountant ("CPA"), a certified fraud examiner, and a certified forensic account and is certified in financial forensics (2 Trial Tr. at 129). She is a member of the American Institute of CPAs, the Mississippi Society

of CPAs, the Association of Certified Board Examiners, the American College of Forensic Examiners, and the Central Mississippi Chapter of Certified Fraud Examiners. (2 Trial Tr. at 129-30). In the last few years, she has taught financial fraud and forensics throughout the country. (2 Trial Tr. at 130).

Ingram testified that Colson did not disburse escrow funds in closings as he had promised. Ingram opined that "monies that were put into the [Wachovia Funding Account] and other escrow accounts of Mr. Colson's, and that monies were used for other than [their] intended purpose; that at the time the funds were closed, there were not sufficient funds available to pay the different lenders that had advanced monies to Mr. Colson and his entities; and that there was a shortfall that did, in fact, exist." (2 Trial Tr. at 134). Ingram based her opinion upon her review of bank statements, general ledgers, tax returns, financial statements, tax returns prepared by Culumber, the depositions of Culumber, Houston, and Colson, emails, selected claims files, the Prestige Agency Agreement, and the Advanced Title Agency Agreement. (2 Trial Tr. at 133-34).

Ingram prepared four (4) charts as demonstrative aids at Trial to demonstrate how the escrow funds flowed through Colson's accounts and how some of the escrow funds failed to reach their intended destination. (Pl. Ex. 203). The first three (3) charts add varying degrees of complexity to the flow of money through the accounts, culminating in the last chart which shows how Colson actually structured the accounts.

The first chart, which is the simplest, shows money flowing from a lender to the escrow account and, then, at the closing, money flowing from the escrow account to the entities identified by the lender in its closing instructions. (Pl. Ex. 203; 2 Trial Tr. at 135-36). These entities typically include any lenders with existing liens on the property.

Included among these entities is Prestige, the title agent who receives a fee as compensation for its escrow services. Prestige deposits those closing fees into the Operating Account from which business expenses are paid. After each closing, the escrow account returns to a zero balance.

The next two (2) charts add the Wachovia Funding Account, which is also an escrow account and which Colson used as an initial depository account for all escrow funds. (Pl. Ex. 203). Just prior to a real estate closing, the escrow funds are transferred from the Wachovia Funding Account to the escrow account associated with that specific real estate closing. (2 Trial Tr. at 138). The second and third charts demonstrate how the "sweep" feature of the Wachovia Funding Account interrupts the flow of money from the lender to the escrow accounts. (2 Trial Tr. at 137). Because balances in the escrow accounts are "swept" into the Wachovia Funding Account on a daily basis, reconciliations of the individual escrow accounts are essentially meaningless unless the Wachovia Funding Account is reconciled too. Also, the second and third charts show transfers not only from the escrow accounts to the Operating Account, representing the payment of closing fees, but also from the Wachovia Funding Account directly to the Operating Account. (2 Trial Tr. at 140).

The final chart adds the Abstract Account. Funds are transferred from the Wachovia Funding Account into the Abstract Account as well as into the Operating Account, and the escrow accounts. (2 Trial Tr. at 141). The final chart shows how Colson actually managed his accounts. Notably, the Abstract Account was not a part of the general ledger or tax returns. None of the monies deposited into the Abstract Account were reported to Culumber or to the IRS.

### 2.   Culumber

Culumber was called by Colson as an expert witness in the field of accounting. Culumber is a certified public accountant.  (5 Trial Tr. at 15).  He obtained a bachelor of science degree and a master's of science degree with an emphasis in taxation from the University of Southern Mississippi in 1978.  From 1983 until shortly before Trial, he worked at an accounting firm in Gulfport, Mississippi, that bore his name, Culumber, Harvey & Associates.  Currently, he is the chief administrative officer of a health-care management company.

Culumber testified that in the performance of his duties as an accountant for Prestige, he found no indication that Colson had engaged in fraud.  (5 Trial Tr. at 43-44). Culumber believed that the shortfalls in the Title Companies' escrow accounts existed because the Title Companies simply "grew too large too fast."  (5 Trial Tr. at 47).  "Well, in my professional opinion . . . the problems, accounts over many years of mistakes, those problems did not become apparent until the housing market came to a crash."  Culumber also said that Colson demonstrated "poor accounting practices" by mixing his fee income in the Wachovia Funding Account with escrow funds.  (5 Trial Tr. at 44, 47-48).

### 3.   Shows

Shows, Fidelity's legal expert, testified that Colson breached his fiduciary duty to the lenders and that his breach resulted in a defalcation.  (3 Trial Tr. at 13-14, 27; Pl. Ex. 128 at 6).  Shows is a real estate lawyer who has practiced law since 1970.  In his current law practice, he regularly provides escrow services to lenders and borrowers in real estate loan closings.  He described these services as requiring him to hold loan proceeds in an

escrow account and disburse those funds in accordance with the instructions furnished him by the lender prior to a closing.

Shows opined that Colson breached his fiduciary duty to the lenders to ensure that all funds held in escrow were disbursed for their intended purposes. (Pl. Ex. 128). Shows also opined that Colson's conduct was willful, reckless, and nearly intentional, if not intentional, and did not conform to the standard of care of a fiduciary, based on the following facts:

     1.    Colson failed to "two-way" reconcile the bank statements from the Wachovia Funding Account.

     2.    Colson failed to "three-way" reconcile the bank statements from the Wachovia Funding Account.

     3.    Colson maintained the Wachovia Funding Account as a "sweep" account. As demonstrated by the final chart prepared by Ingram, the "sweep" feature made it difficult to account properly for escrow funds.

     4.    Colson structured the bank accounts of Prestige and Advanced Title so that it was difficult to associate escrow funds with a particular real estate loan closing.

     5.    Colson allowed the escrow accounts to become overdrawn on twenty-nine (29) occasions when they had been opened for less than nine (9) months.

     6.    Colson commingled escrow funds with non-escrow funds.

(3 Trial Tr. at 21).

The standard of care owed by real estate escrow agents to lenders, according to Shows, is determined by reference to Mississippi common-law, the closing instructions provided by the lenders, the CPLs, the agency agreements, and the American Land Title Association Best Practices ("ALTA Best Practices"). Shows explained that ALTA Best Practices, which are voluntary guidelines, recommend that closing agents implement

certain procedures and controls for escrow accounts, including the maintenance of escrow funds in a separate account and "three-way" reconciliation of escrow accounts. The standard of care owed by a real estate escrow agent like Colson who is also an attorney, according to Shows, is further defined by the *Mississippi Rules of Professional Conduct,* which expressly prohibit commingling client funds. (3 Trial Tr. at 19).

### C.    Court's Application of *Bullock*

The Court, applying *Bullock*'s "severe recklessness" standard to the facts presented here, finds that Colson, an experienced title agent and lawyer, committed a defalcation within the meaning of § 523(a)(4).[27] The evidence presented at Trial and, in particular, the expert testimony of Ingram and Shows, established that Colson knew of, or consciously disregarded, a substantial and unjustifiable risk that his conduct would violate his fiduciary duty to the lenders. The evidence further established that Colson's disregard of that risk involved a gross deviation from the standard of care that a law-abiding title agent and/or lawyer would observe in Colson's place.

Simply put, the Court finds that Colson's use of the Wachovia Funding Account was akin to a *Ponzi*[28] scheme in that Colson depended upon funds generated in new real estate closings to pay off earlier closings. The escrow deficiency was managed without much difficulty from 2001 until 2006, because of the refinancing boon. The down turn in the real estate market beginning in 2006, however, created problems for Colson. Moreover, the two-week shutdown of his title insurance business caused by

---

[27] In concluding that under the heightened standard of intent announced in *Bullock*, Colson committed a defalcation, the Court likewise concludes that Colson's conduct constituted a "willful neglect of duty" and met the lower objective-recklessness standard expressed in *Schwager*, 121 F.3d at 185, to establish a defalcation.

[28] *Cunningham v. Brown*, 265 U.S. 1, 7-8 (1924) (describing pyramid scheme of Charles Ponzi, whose name later became synonymous with investment fraud).

LandAmerica's bankruptcy filing and the "fresh look" by Fidelity of his accounts exposed these problems. As a result, Colson began holding checks for longer periods of time, sometimes as long as forty-seven days (47), as he became increasingly dependent upon new money coming in from real estate closings to cover payments due in previous closings. This is demonstrated by the chain of emails on January 29, 2009, among the branch manager of the Gulfport Office, Colson, and Houston, as follows:

> *10:22 a.m. (from branch manager to Colson and Houston):*
> I need this wire to go out before 2pm today. This is an REO foreclosure, and if they don't receive it today, then we will have to re-close. This closing has been a complete nightmare from day one!
>
> $213,642.63 to JP Morgan Chase NA for file #07-08-40 REO.
>
> *11:54 a.m. (from Colson to Houston):*
> What do you think? Call me. . .
>
> *11:55 a.m. (from Houston to Colson):*
> Wait just a little bit then we can get it out for her. I think that other one can wait until tomorrow if necessary. We still have some things to come in.

(Pl. Ex. 118, Excerpt D). The continual need for new deposits was so great in 2008 and 2009 that Colson began to commingle funds. He deposited Martin's investment funds and A&O's viatical settlement funds into the Wachovia Funding Account to help conceal the escrow deficiency.

In reaching the conclusion that Colson's conduct amounts to a defalcation, the Court rejects both of Colson's arguments regarding Fidelity's alleged failure to trace the missing escrow funds or to prove his actual intent to misappropriate escrow funds. First, Colson argues that Fidelity cannot trace the missing escrow funds to the money used by Colson to pay his personal expenses. Colson asks: Was the source of the money the fees that Prestige and Advanced Title were entitled to receive for performing the services of a

closing agent?  Were the missing funds part of the approximately $1.7 million previously deposited into the registry of the Bankruptcy Court as a result of the Interpleader Actions?  Were the missing funds the result of accounting errors by Wachovia, Regions, or another bank?  Colson insists that unless Fidelity answered these questions at Trial, its evidence was insufficient to establish Colson's intent.  At best, according to Colson, the evidence showed that he intended to commingle escrow funds with non-escrow funds.

The Court agrees with Colson that the question of what happened to the money was not answered definitively at Trial.  The Court rejects, however, Colson's attempt to use Fidelity's inability to trace the escrow funds as a defense to his breach of the fiduciary duty he owed the lenders.  It was Colson who structured the accounts in a way that allowed him to play hide-and-seek with escrow funds.  To allow Colson to benefit from the complexity of that structure by requiring Fidelity to untangle the commingled funds would reward him for how well he succeeded in breaching his fiduciary duty to the lenders.

The evidence at Trial showed that the total amount of escrow funds that Colson transferred from the Wachovia Funding Account directly into the Operating Account and the Abstract Account in 2008 and 2009 greatly exceeded the amount of closing fees reported by the branch managers.  From November 2008, through January 2009, he withdrew approximately $2.5 million from the Wachovia Funding Account that he distributed for a purpose unrelated to any real estate closings.  The Wachovia Funding Account was the source of almost all of the funds deposited into the Abstract Account from which Colson made regular withdrawals to pay his personal and other expenses.  Withdrawals from the Abstract Account from January 2008 through January 2009,

included wire transfers to the following entities in which Colson had an ownership interest:   Vic's Chophouse ($183,000.00), SJS Development, LLC ($162,135.00), Rosewood Development, LLC ($55,000.00), and TCG Telecom, Inc. ($31,702.93). During this same time frame, Colson paid from the Abstract Account:  $236,900.00 to himself, $40,000.00 to his cousin, Tim Colson, and $557,205.76 to American Express. The Abstract Account was not the only account used by Colson to pay his personal expenses.  He also withdrew funds for his personal benefit from the Operating Account. The withdrawals from the Operating Account, unlike the withdrawals from the Abstract Account, were known to Culumber and included in the tax returns he prepared for Colson.

The negative balances in the Wachovia Funding Account at the end of January and in early February 2009, meant that the escrow funds in the real estate closings in which Fidelity sustained losses had disappeared before Wachovia, and then Regions, had closed Colson's accounts.  (2 Trial Tr. at 158).  Later deposits into the Wachovia Funding Account from other lenders and sources could not have replenished the missing escrow funds or cured the breach of Colson's fiduciary duty to the lenders, as Colson suggested at Trial.

Colson apparently believed that he was making more than enough money to justify his personal expenditures from the Wachovia Funding Account via the Abstract Account.   How much income Prestige and Advanced Title actually generated by providing escrow services was just as elusive to Fidelity as it was to Ingram, Culumber, the Trustee, and the IRS.  (Dkt. 374).  Colson did not file tax returns for the 2005-07 tax years and the absence of meaningful accounting records prevented the Trustee from

preparing tax returns for Colson or for any of his business entities during the same pre-petition years. (*Id.*).

Yet, Colson, as the trustee of the escrow funds, "[was] not permitted to place himself in a position where it would be for his own benefit to violate his duty to the beneficiaries." 2A A. SCOTT, & W. FRATCHER, TRUSTS § 170, at 311. By structuring the accounts in such an illogical, if not absurd way, so as to make it impossible for anyone to track his earned income, Colson did just that, whether intentionally or not.

Moreover, Colson's supposition that all of the money he spent from the Abstract Account constituted earned income is belied by the fact that he did not report any of that money from the Abstract Account as income for tax purposes. Culumber, the accountant who prepared his individual tax returns, was not even aware of the Abstract Account.

The Court rejects Colson's attempt to turn the Adversary into a tracing case, which it is not. In the Interpleader Actions where the tracing issue was litigated by the Trustee, it was determined that most of the interpled funds deposited in the Bankruptcy Court registry by Wachovia and Regions were not subject to a trust. As to the small number of claims that could be traced to the interpled funds, the Trustee released those trust funds to the particular claimants. *See Hanley v. Notinger (In re Charlie's Quality Carpentry*, LLC), No. 02-11983, 2003 WL 22056647, at *4 (Bankr. D.N.H. Aug. 25, 2003) (property of a bankruptcy estate does not include property that a debtor holds in trust). The remaining funds, which could not be traced to any trust, were turned over to the Trustee as property of Colson's bankruptcy estate.

Colson's second argument, which the Court also rejects, is that he did not intend to use escrow funds for his personal benefit. Although the Supreme Court in *Bullock*

applied a degree of fault for a finding of a defalcation, similar to the fault required for a finding of fraud, embezzlement, and larceny, which are all "statutory neighbors" of defalcation in § 523(a)(4), and although the new standard in *Bullock* raised the degree of fault from what the Fifth Circuit had previously applied, the Supreme Court did not impose a requirement of specific intent.   Colson, therefore, may not escape from his debt arising out of defalcation by simply saying he had no specific intent to divert the missing trust funds.   Although Colson did not dispute at Trial that there were shortfalls in the Title Companies' accounts, he testified that he never intended to divert trust funds for his own personal benefit.   (4 Trial Tr. at 108-09).   Colson's denial of a malicious motive is not enough to remove the debt owed Fidelity from the defalcation exception.

Of course, a debtor accused of defalcation is not likely to admit that he intended to divert trust funds.   In the absence of such an admission, it is the surrounding facts and circumstances that provide the equivalent level of wrongdoing.   The type of analysis required by the Supreme Court in *Bullock*, when there is no direct evidence of specific intent, is suggested by its analogy to the scienter determinations in federal securities cases.   Scienter in securities fraud cases, according to the Fifth Circuit, is "an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."   *RZ Invs. LDC v. Phillips*, 401 F.3d 638, 643 (5th Cir. 2005) (citation omitted).   "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involved not merely simple or even inexcusable neglect, but an extreme departure from the standard of ordinary care."   *Id.* (citation omitted).

The mere fact that Colson was running a *Ponzi* scheme is sufficient to demonstrate severe recklessness and an extreme departure from the standard of ordinary care. Colson had to have known that a *Ponzi* scheme cannot operate in perpetuity and, consequently, that there was a high risk that the lenders and individuals in those real estate closings near the end of the *Ponzi* scheme would lose their money.

Despite his qualifications, the Court rejects Culmber's opinion that Colson did not intend to defraud anyone because he based his opinion solely on his knowledge of the Operating Account. While employed by Colson, Culmber did not review the Wachovia Funding Account or any of the escrow accounts. (5 Trial Tr. at 51). More important, Culmber did not know about the Abstract Account until sometime after Colson had commenced his bankruptcy case. For that reason, none of the transfers to or from the Abstract Account is reflected in the general ledgers of Prestige or included in any of the tax returns prepared by Culumber.

Colson relies upon the QARs as evidence that he had no motive to self-deal: because he was subjected to numerous audits by Lawyers Title and was told continually by Lawyers Title that there were no serious problems in the escrow accounts, he insists he had no reason to know about the escrow deficiencies. The Court views Colson's reliance on the QARs as his attempt to delegate onto Lawyers Title the fiduciary duty he himself owed to the lenders. Although it is possible that Lawyers Title was negligent in performing the QARs, that issue is immaterial in assessing Colson's duty to the lenders. Moreover, the QARs were conducted for the benefit of Lawyers Title, not Colson.

In Mississippi and elsewhere, lawyers are required to be above reproach and reach beyond the standards to which others would be held in ordinary commercial dealings. In

*Gwin v. Fountain*, 126 So. 18, 22 (Miss. 1930), the Mississippi Supreme Court held that "[t]he relation of attorney and client is one of special trust and confidence. The law requires that all dealings between them shall be characterized by the utmost fairness and good faith on the part of the attorney." While fulfilling his obligations to the lenders under the closing instructions, Colson was subject to the standard of care applicable to the legal profession. Mississippi lawyers owe their clients a duty of loyalty, which speaks to the fiduciary nature of the lawyer-client relationship. *Singleton v. Stegall,* 580 So. 2d 1242, 1244-45 (Miss. 1991). As a licensed Mississippi attorney, Colson had a fiduciary obligation to safeguard the escrow funds pursuant to MRPC 1.15(a), which provides:

> A lawyer shall hold clients' and third persons' property separate from the lawyer's own property. Funds shall be kept in a separate trust account maintained in the state where the lawyer's office is situated, or elsewhere with the consent of the client or third person. Other property shall be identified as such and appropriately safeguarded. Complete records of such trust account funds and other property shall be kept and preserved by the lawyer for a period of seven years after termination of the representation.

MRPC 1.15(a); *Hartford Acc. & Indem. Co. v. Foster*, 528 So. 2d 255, 267-70 (Miss. 1988). Moreover, MRPC 1.15(j) provides, "A lawyer generally may not use, endanger, or encumber money held in trust for a client or third person without the permission of the owner given after full disclosure of the circumstances." MRPC 1.15(j). *See Gardner v. Deer (In re Deer),* No. 07-00060-NPO, 2008 WL 723982 (Bankr. S.D. Miss. Mar. 14, 2008) (attorney who transferred funds from trust account within twenty-four (24) hours of receiving deposits without verifying legitimacy of disbursements committed a defalcation rendering $565,000.00 debt nondischargeable under § 523(a)(4)). Colson

committed a defalcation while acting in a fiduciary capacity for the reasons succinctly

stated by Ingram:

> [T]here was an intentional diversion of funds that were put into the hands
> of Mr. Colson, in his fiduciary position—that there were funds put into his
> hands for loan closings.  Those monies were not available for loan
> closings at the end of the day.  Those monies ended up being diverted into
> other accounts, primarily the operating account and the abstract account.
> The monies that were put into those accounts were over and above what
> were his earnings for performing those closings.
>
> Those excess monies that went into those two accounts were used for his
> benefit or the benefit of his related entities to the detriment of those
> lenders and the ultimate folks that were supposed to benefit from those
> real estate proceedings that were put into his hands.

(2 Trial Tr. at 184).

### III.   Attorneys' Fees and Expenses

Fidelity seeks to recover its attorneys' fees and costs of litigation under the

following provision of the Prestige Agency Agreement.

> [Prestige] shall be liable to [Fidelity] for, and hereby agrees to indemnify
> [Fidelity] against any loss, cost or expense, including attorneys' fees and
> costs of litigation, sustained or incurred by [Fidelity] and arising from the
> fraud, negligence or misconduct of [Prestige] or any agent, servant, or
> employee of [Prestige], whether or not such loss, cost or expense shall
> result from any Policy issued by Prestige.

(Pl. Ex. 99 at 4).  Fidelity alleges that it incurred $1,413,698.60 in attorneys' fees in

connection with the prosecution of the Adversary.  This amount does not include

attorneys' fees incurred in preparation of and during Trial.

A creditor is entitled to attorney's fees and costs if it has a contractual right to

them under state law.  *Country Credit, LLC v. Kornegay* (*In re Kornegay*), No. 11-00042-

KMS, 2012 WL 930818, at *5 (Bankr. S.D. Miss. Mar. 19, 2012) (citing *Jordan v. Se.

Nat'l Bank (In re Jordan)*, 927 F.2d 221, 226-27 (5th Cir. 1991)).  Consequently, the

Court finds that Fidelity is entitled to its attorneys' fees and costs of litigation, in a total amount yet to be determined, and further finds that the attorneys' fees and costs are nondischargeable. *See Gober v. Terra Corp. (In re Gober)*, 100 F.3d 1195, 1208 (5th Cir. 1996) ("[w]hen the primary debt is nondischargeable due to willful and malicious conduct, the attorney's fees and interest accompanying compensatory damages, including post judgment interest, are likewise nondischargeable.").

## CONCLUSION

For the reasons discussed above, the Court finds that Fidelity has proved by a preponderance of the evidence that Colson breached a fiduciary duty and committed a defalcation while acting in a fiduciary capacity. Accordingly, the Court concludes that Fidelity is entitled to a judgment against Colson in the following amounts:

1.      $4,904,627.37 for breach of the fiduciary duty and

2.      attorneys' fees and costs of litigation incurred by Fidelity in an amount yet to be determined.

The Court further concludes that the entire debt owed to Fidelity is excepted from discharge as a debt arising from a defalcation while acting in a fiduciary capacity pursuant to § 523(a)(4). By separate notice, the Court will schedule a hearing to consider the amount of Fidelity's attorneys' fees and costs of litigation. After the Court has determined the amount of these fees and costs, the Court will enter a final judgment in the Adversary.

SO ORDERED.

Neil P. Olack
United States Bankruptcy Judge
Dated:  September 23, 2013